2008 ME 36

**MAINE EYE CARE ASSOCIATES P.A.**

v.

**Timber H. GORMAN.**

Supreme Judicial Court of Maine.

Submitted on Briefs: Sept. 27, 2007.

Decided: Feb. 28, 2008.

Bernard J. Kubetz, Esq., Eaton Peabody, Bangor, ME, for Timber H. Gorman, M.D.

William D. Robitzek, Esq., Paul F. Macri, Esq., Berman & Simmons, P.A., Lewiston, ME, for Maine Eye Care Associates, P.A.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, and MEAD, JJ.

MEAD, J.

[¶ 1] Timber H. Gorman appeals from a judgment of the Superior Court (Kennebec County, *Studstrup, J.*), entered upon remand from this Court, finding for Maine Eye Care Associates, P.A. (MECA) on its claims against Gorman alleging fraudulent misrepresentation and unjust enrichment and awarding MECA damages. Gorman argues that the findings of fraudulent misrepresentation and unjust enrichment lack adequate support in the record.[1] We vacate the judgment.

## I. BACKGROUND

[¶ 2] The following facts, found by the court during the jury-waived trial and incorporated by reference in its judgment on remand, are undisputed except as indicated. In 1994, G. Madison Cravey, M.D., sold his ophthalmic practice in Ellsworth to MECA for over $200,000. The purchase price was allocated primarily to tangible personal property for purposes of taking depreciation, although the purchase and sale agreement also recognized that medical records and charts were being purchased. After selling the practice to MECA, Cravey became an employee of MECA pursuant to an employment agreement.

[¶ 3] In 1996, ophthalmologist Timber Gorman, M.D., became a MECA employee in Ellsworth. Gorman entered into year-long employment agreements on My 5, 1996, and August 26, 1997. Gorman's second employment contract, unlike Cravey's, included a provision that she would not practice medicine in competition with MECA for a period after she voluntarily separated from MECA or was dismissed, even if the termination or dismissal occurred after the expiration of the employment term. In 1998, MECA's then-chief executive officer, John Bell, proposed to Gorman that she enter into a new employment agreement. Gorman refused but continued working as a MECA employee.

[¶ 4] Between 1998 and 2000, MECA became concerned about the weak performance of the Ellsworth office. In May 2000, MECA approached Dr. Larry Piazza to determine if he would like to associate with MECA, but he declined. By fall 2000, MECA had decided to sell the Ellsworth practice. The parties dispute whether Gorman and Cravey told MECA

---

1. We do not reach Gorman's additional argument that the court employed an unsupported and improper measure of damages.

they would buy the practice or some of its assets. MECA witnesses testified that Gorman and Cravey stated at a September 2000 meeting that they wanted to buy the practice, while Gorman testified she never said she wanted to buy the practice but was potentially interested in buying only select furnishings.[2] There is also a dispute as to whether MECA approached Dr. Piazza in September or October of 2000 to see if he wanted to purchase the practice. The court found that MECA provided "the more accurate rendition of the facts." The parties agree that no purchase and sale agreement was ever signed and that no formal agreement on terms such as price was ever reached.

[¶ 5] MECA terminated Gorman and Cravey's employment as of January 1, 2001, at which time Gorman and Cravey continued to serve primarily the same MECA patients in the same location under the name of Downeast Eye M.D. This change in name was announced to prior patients and to the public, in part through an advertisement placed by MECA. Gorman and Cravey rented from MECA the premises, equipment and use of the patient charts for $6595 per month from the period of January through October 2001. After providing notice to MECA of its intent to vacate MECA's premises in a letter dated September 12, 2001, Downeast Eye

moved to a new building on October 31, 2001, leaving the patient charts and most or all of the older equipment behind.[3]

[¶ 6] MECA filed a complaint against Gorman in October 2002, alleging, among other things not at issue here, fraudulent misrepresentation and unjust enrichment. Following the trial, the court entered a judgment in favor of MECA on these counts. The court found "by a preponderance of the evidence that [MECA's] version of what was intended and what transpired ... is the more accurate rendition of the facts," and that it "was more impressed with the accuracy and credibility of the version of events related by [MECA]." The court awarded damages of $176,760.

[¶ 7] Gorman appealed from that judgment. We vacated the court's finding of liability for fraudulent misrepresentation because the court had failed to apply the clear and convincing evidence standard as to all elements of the claim, including whether MECA's reliance on Gorman's alleged representation was justified. *See Maine Eye Care Assoc. v. Gorman*, 2006 ME 15, ¶¶ 1, 22, 890 A.2d 707, 708, 712. (*MECA I*). We also vacated the court's finding of liability for unjust enrichment because the court's determination that Gorman had taken patient files with her when she moved out of MECA's facility

**2.** The parties point out that John Bell, MECA's former CEO, testified that Gorman and Cravey represented at the September 2000 meeting that they wanted to purchase the practice. However, Bell contradicted his own testimony when he later stated that, as of a few days after that September meeting, "we were not aware that [Gorman] would be purchasing the practice. We were assuming [Cravey] was repurchasing the practice...." Other testimony states or implies, however, that Gorman did at some point represent that she would purchase the practice. The clearest evidence on this point is Bell's testimony that, "Relatively early in the process but not at the September meeting we were informed

that Dr. Gorman would be buying the practice, and Dr. Cravey would be working for her," and that "at that point [after January 2001] the discussions really became with Dr. Gorman because they'd indicated that she would be buying the practice...."

**3.** The only new fact the court found upon remand was that Gorman did not take any patient charts with her when she vacated MECA's offices. The court corrected this factual finding after erroneously finding in its first judgment that Gorman had retained possession of the charts when she moved.

was clearly erroneous. *Id.*, 2006 ME 15, ¶¶ 1, 27, 890 A.2d at 708, 712–13. We ordered the trial court to redetermine damages if the court found liability arising from fraudulent misrepresentation or unjust enrichment on remand. *Id.*, 2006 ME 15, ¶ 28, 890 A.2d at 713.

[¶ 8] In its judgment on remand, the trial court adopted the factual findings it had originally made following the trial, except for finding that Gorman had not taken patient files with her when she vacated MECA's premises. The court determined on remand that Gorman was liable on MECA's claim of fraudulent misrepresentation, finding by clear and convincing evidence that (1) Gorman represented to MECA that she and Cravey were going to buy the practice including the charts, but that she knew she intended to buy just the "charts or goodwill" rather than the entire practice; (2) she "led MECA to allow her" to use its goodwill, location, and equipment to start her new practice; (3) MECA relied on Gorman's representation that she would buy the practice, as evidenced by the fact that it did not seek out other buyers, allowed her to use its files, and advertised her new practice; and (4) MECA relied on Gorman's representation to its detriment. The court did not expressly find that MECA's reliance on Gorman's representation was justifiable.

[¶ 9] As to the unjust enrichment claim, the court found by a preponderance of the evidence that, even though Gorman did not retain patient files when she moved out of MECA's offices, she was unjustly enriched by her use of the files during the ten-month period she rented space from MECA to build up her practice. The court found that a portion of the rent she paid related to her use of the patient charts during the rental period, but that the amount did not represent the full value of the goodwill that Gorman took from MECA's previous practice when she left to establish her own practice. The court found that the rental agreement was entered into with the assumption that Gorman would subsequently purchase MECA's practice and that the ultimate purchase price would have reflected the remainder of the value of the goodwill. The court also found that MECA would not have allowed Gorman use of the patient files if it had not believed she was going to buy the practice.

[¶ 10] The court found damages on the unjust enrichment and fraudulent misrepresentation claims in the amount of $121,333, which was derived from the value of the goodwill of the practice. The court found that the goodwill of the practice was valued at $143,000 and that the "patient charts and contents are a very significant portion of the value of the good will."[4] The court then determined that Gorman had already paid $21,667 towards the value of the goodwill, concluding that one-third of the approximately $65,000 Gorman paid in rent, or $21,667, was attributable to her use of the patient charts. After reducing $143,000 by $21,667, the court awarded damages to MECA in the amount of $121,333. Gorman now appeals the court's judgment.

## II. DISCUSSION

### A. Fraudulent Misrepresentation

[¶ 11] Gorman contends that the court erred in finding her liable for fraudulent misrepresentation because (1) the record does not contain clear and convincing evidence that Gorman represented that she

---

**4.** The court claimed to have derived this amount from evidence of "an earlier sales attempt of the business by MECA" in which the goodwill of the practice was valued at $143,000.

wanted to purchase the practice, or that MECA relied on the alleged representation, and (2) even if MECA did rely on her alleged representation, that reliance was not justifiable, a finding that the court failed to make expressly. MECA responds that the record contains clear and convincing evidence that MECA justifiably relied on Gorman's representation that she and Cravey would buy the practice.[5]

[¶ 12] To prevail on its claim of fraudulent misrepresentation, MECA must prove by clear and convincing evidence:

(1) that [Gorman] made a false representation; (2) of a material fact; (3) with knowledge of its falsity or in reckless disregard of whether it is true or false; (4) for the purpose of inducing [MECA] to act in reliance upon it; and (5) [MECA] justifiably relied upon the representation as true and acted upon it to [its] damage.

*MECA I*, 2006 ME 15, ¶ 19, 890 A.2d at 711 (alteration in original; quotation marks omitted). "In order to affirm a judgment when the standard of proof is by clear and convincing evidence, we must determine that the factfinder could reasonably have been persuaded that the required findings were proved to be highly probable." *Mariello v. Giguere*, 667 A.2d 588, 590 (Me.1995) (quotation marks omitted).

[¶ 13] The court made findings as to the first four of the five elements of MECA's fraudulent misrepresentation

claim.[6] Although the record does not contain a wealth of evidence as to these four elements, we nonetheless conclude that the court could have found these four elements by clear and convincing evidence, giving deference to the court's ability to assess the credibility of the witnesses and to weigh the evidence. *See Dombkowski v. Ferland*, 2006 ME 24, ¶ 28, 893 A.2d 599, 606. We therefore decline to disturb the court's findings as to the first four elements. This issue then turns on the fifth element of the fraudulent misrepresentation claim, i.e., whether MECA justifiably relied upon Gorman's representation as true and acted upon it to its damage.

[¶ 14] We remanded this case in *MECA I* with instructions to the court to find, applying the clear and convincing standard, whether MECA was justified in relying on Gorman's conduct. *See* 2006 ME 15, ¶¶ 1, 22, 890 A.2d 707, 708, 712. The court's judgment does not address this issue, however. Based on a thorough review of the record, we conclude that it is devoid of any manner of evidence, clear and convincing or otherwise, to support such a finding.

[¶ 15] The record indicates that Gorman made, at best, a generalized statement of intent to purchase the practice from MECA. It was upon this generalized statement alone, however, that MECA allegedly relied in assuming that Gorman would purchase the practice. There is no indication, other than MECA's unilateral assumptions, that discussions with Gorman

---

**5.** MECA also argues that Gorman waived review of the fraudulent misrepresentation claim other than the justifiable reliance element because she did not raise those issues in her first appeal. Although in *MECA I* we specifically reviewed the trial court's decision on the issue of justifiable reliance, we vacated the court's finding of Gorman's liability for fraudulent misrepresentation generally, requiring the court to apply on remand the proper standard of proof to all elements of the

claim. *Maine Eye Care Assoc. v. Gorman*, 2006 ME 15, ¶¶ I, 22, 890 A.2d 707, 708, 712. (*MECA I*).

**6.** The court did not expressly find that Gorman's misrepresentation was with respect to a *material fact*, but the parties have not disputed the implied finding that a material fact is at issue.

about the purchase of the practice ever advanced beyond a preliminary and generalized expression of interest.[7] There is no evidence that MECA and Gorman ever discussed or agreed upon a purchase price, that the parties discussed what assets or liabilities were to be transferred, or that the parties agreed to a date upon which to consummate the sale. Although MECA witnesses repeatedly testified that they "assumed" Gorman would buy the practice, the record does not indicate why those assumptions were justified. As a result, we conclude as a matter of law that MECA's reliance on Gorman's unadorned expression of interest does not satisfy the "justifiable reliance" element of the fraudulent misrepresentation claim and that the court could not reasonably have been persuaded that MECA proved to a high probability that MECA's reliance on Gorman's representation was justifiable. Therefore, MECA's fraudulent misrepresentation claim against Gorman must fail.

## B. Unjust Enrichment

[¶ 16] Gorman next contends that the court erred in finding her liable for unjust enrichment, arguing that she paid MECA a fair monthly rent for her use of MECA's facilities and patient files before vacating MECA's offices and that she did not unjustly retain any benefit from her association with MECA after she moved out. MECA argues that, even though Gorman did not take patient charts with her, an advantage was conferred upon her when she was given access to the patient charts during the ten-month rental period, which enabled her to start her own practice.[8]

[¶ 17] To establish unjust enrichment, the complaining party must show that:

(1) it conferred a benefit on the other party; (2) the other party had appreciation or knowledge of the benefit; and (3) the acceptance or retention of the benefit was under such circumstances as to make it inequitable for it to retain the benefit without payment of its value. *MECA I*, 2006 ME 15, ¶ 26, 890 A.2d at 712 (quotation marks omitted). "Trial court determinations on the elements of unjust enrichment are factual issues that will not be set aside as clearly erroneous unless there is no competent evidence in the record to support them." *Forrest Assoc. v. Passamaquoddy Tribe*, 2000 ME 195, ¶ 14, 760 A.2d 1041, 1046.

[¶ 18] In order to prevail in its claim of unjust enrichment against Gorman, it is critical that MECA establish that Gorman used or "retained" MECA's patient files, i.e., its goodwill, without adequately compensating MECA. This, in turn, requires that the record contain evidence establishing the monetary value of the files or goodwill of the practice. Neither party offered competent expert testimony as to the value of the patient files.[9] We do not otherwise find competent evi-

---

7. Record evidence, including that cited by MECA, does not support MECA's contention that it justifiably relied on Gorman's representation because it consists of letters written by MECA or its counsel that either do not reference the sale of the practice to Gorman or are not addressed to Gorman. This evidence shows, at best, that MECA believed or assumed that Gorman was going to purchase the practice, but not that MECA's beliefs were justified.

8. The record establishes that Gorman had full access to the patient records before and during the ten-month rental period.

9. MECA argues that Gorman's expert valued the practice's goodwill represented in the patient records at $185,000. That expert actually testified, however, that he valued MECA's assets as of November 1, 2001, at $170,000 and the patients records at $15,000 (1000 records the expert thought might be sold to former MECA patients multiplied by the $15 fee MECA assessed for copying records), and

dence in the record to support the court's finding as to the files' value.[10] Because the court cannot find that a defendant was unjustly enriched without first finding that something of value has been taken or retained without adequate compensation, MECA's claim as to unjust enrichment also fails.

The entry is:

Judgment vacated. Remand for entry of a judgment in favor of Gorman on the counts of fraudulent misrepresentation and unjust enrichment.

he valued them as if the practice were in liquidation instead of a going concern. MECA's expert valued MECA's practice as a whole at $404,000 as of December 31, 2000, but an indeterminate part of that figure apparently includes assets other than goodwill. Thus, contrary to MECA's assertions, the record does not contain competent evidence to support the court's finding of the value of the practice's goodwill.

10. In fact, the only evidence on the record indicates that Gorman was not unjustly enriched. MECA was solely responsible for setting the rental amount, the rental amount MECA charged Gorman was derived from its own valuation of the practice as whole (with no apparent discount on the grounds that it assumed Gorman would buy the practice), and the monthly rent included Gorman's use of the records. Furthermore, although the court concluded that MECA undercharged Gorman for her use of the files on the assumption that she would pay the full value when she bought the practice, that finding is not based on competent evidence because MECA expressly allowed Gorman to continue using the patient charts, without charging her additional rent, for one to two months after it admitted knowing she would not buy the practice. In addition, the court appeared to conclude that Gorman was unjustly enriched by her access during the rental period to all of the files in MECA's offices even though MECA's former CEO testified that any files created by Gorman for new patients after she started her practice on January 1, 2001, and any entries she made with respect to existing patients after she started her new practice, even if the entries updated preexisting MECA files, were her property at all times.