STATE OF MAINE                    SUPERIOR COURT
HANCOCK, SS.                      CIVIL ACTION
                                 Docket No. RE-06-20
                                 JLH  ?' ' '   5/p/~op/

Janice Bakala Glenn,
        Plaintiff


        v.                                  Decision and Judgment


Ronald L. Bakala,
        Defendant


        Hearing on the complaint was held on August 6 and 9, 2007. On both hearing
dates, the parties were present with counsel.

        In this action, the plaintiff, Janice Bakala Glenn, contends that the defendant,
Ronald Bakala, who is her brother, made an enforceable promise to her under which, in
exchange for the care she provided to their mother, he or his estate would convey to her
real property located on Deer Isle. The property is the site of a building known as the
Parish House. Glenn also claims that Bakala unlawfully evicted her from the premises
and interrupted utility service to the premises, rendering him liable under statutory causes
of action. Bakala acknowledges that he expressed an intention to transfer the property to
Glenn by will but denies that the intended conveyance is enforceable. Bakala also denies
liability for unlawful eviction.

        There does not exist a written agreement providing that Bakala would convey the
Parish House premises to Glenn. An unwritten agreement to transfer real property
becomes enforceable only if the prospective grantee proves the existence of the
agreement and the applicability of an exception to the statute of frauds, 33 M.R.S. §
51(4). See Sullivan v. Porter, 2004 ME 134, ¶ 10, 861 A.2d 625, 630. Here, Glenn relies
on the part performance exception to the statute of frauds, arguing that she partially
performed her obligation under the agreement and that Bakala induced that partial
performance. Id., ¶ 11, 861 A.2d at 630. This contention requires her to prove the
following points by clear and convincing evidence: 1) that she and Bakala entered into a

1

contract for the conveyance of the premises; 2) that she partially performed her obligations under the agreement; and 3) that she was induced to do so by Bakala's misrepresentations. *Id.*, 861 A.2d at 630.

For the reasons set out in this order, the court ultimately concludes, first, that Glenn has not established clearly and convincingly that she and Bakala entered into an agreement under which Bakala would convey the Parish House premises to her, and, second, that she has also failed to prove by the requisite evidentiary standard that through some misrepresentation, he induced her to act or perform under an ostensible contract.

Glenn lived nearly continuously with the parties' mother, Genevieve Bakala, through her death in 2002. During much of that time, they lived in Florida. Bakala himself lived in Maine since at least the early 1980's. In 1981, around the time Genevieve suffered a heart attack, she began to spend her summers in Maine with Bakala at Bakala's Stonington residence. Glenn remained in Florida during the summers until 1985. In 1983, two years after Genevieve began to travel to Maine for the summer, Bakala purchased the Parish House for the purpose of providing a place for Genevieve to open an antiques business. Bakala paid the purchase price for the property, and he also paid for extensive renovations to render the building habitable. Bakala maintained title to the property. Throughout the time he has owned it – even through the time subsequent to Genevieve's death, while Glenn occupied it --, he has paid for all expenses and services to the premises, including taxes and utilities. Genevieve therefore incurred no expenses for her use of the property, thus increasing her net income from the antiques business. Between the original purchase price and subsequent expenses, Bakala paid more than $150,000 into the property.

For the first several years of its operation, Genevieve operated the business entirely by herself. Despite some of Glenn's statements in her verified complaint, Genevieve was largely self-sufficient. She lived in Bakala's house, using a room requiring her to climb a set of stairs. Glenn herself wanted to come to Maine with Genevieve during the summers. However, she would have had to bring a dog that was known to cause problems, and for that reason Bakala did not make his house available to her. In 1985, however, Glenn's dog died, and Glenn began to spend her summer in Maine. As he did with Genevieve, Bakala provided Glenn with a room in his house.

2

Glenn testified that she accompanied Genevieve to Maine because she (Glenn) expected that Bakala would convey the building to her and that she could operate the antiques business. The court does not accept this testimony as credible. First, Glenn acknowledged that Bakala did not make any promises to her about the disposition of the Parish House. Second, Glenn has stated that she came to spend more time in Maine because she simply enjoyed being here. Third, it is plain from the evidence that Bakala did not induce Glenn to spend her summers in Maine. Rather, of her own accord, Glenn had wanted to live in Maine during the summers even prior to the time she began to do so. She did not have a place in Maine where she could stay other that at Bakala's house, and he would not allow her to reside there because of her dog. Beginning the first summer after her dog died, Glenn traveled to Maine and spent her summers in Maine. Thus, she did not commence her practice of spending the summer months here because of any action or promises by Bakala. Instead, she began her trips to Maine as soon as she Bakala allowed her to stay at his house. Glenn's summer visits to Maine were therefore entirely of her own initiative

When Glenn began coming to Maine for the summer, she worked at the Parish House antiques business. Genevieve paid her menially, but those wages ($20 per day, later increased to $25) exceeded the amounts she earned in Florida. Further, Bakala provided her with shelter and paid for most of her living expenses. He also provided Glenn and Genevieve with a means of transportation: he purchased a car for their use, and he even paid for the gas they needed to drive between Florida and Maine. (Glenn and Genevieve covered their gas expense for local driving while in Maine.)

These arrangements continued through Genevieve's death. Glenn spent much of her time with Genevieve, including during the hours of the antiques store's operation. Until 2001, the two continued to live at Bakala's house. Genevieve had some physical limitations because of her age and medical conditions, and Glenn plainly provided significant assistance to her. However, the court finds that Glenn has overstated the extent of support and assistance she gave to her mother. Glenn had only a limited capacity to provide physical aide to Genevieve, because Glenn had a chronic back condition. She had developed that problem as early as the 1970's, and it prevented her from working in her chosen field of cosmetology. She was hospitalized and spent time

3

rehabilitating in a nursing home due to her back condition. It was an ongoing issue and resulted in surgery in 2001. The court concludes from this evidence that Glenn suffered from a chronic physical disability that limited her ability to provide physical support to her mother.

There are other aspects of the evidence that reveals Glenn's exaggerations of the magnitude of the assistance she provided to Genevieve. For example, Glenn testified that she nearly always prepared lunch for herself and for Genevieve. However, the better evidence establishes – as Glenn ultimate acknowledged – that Genevieve herself participated in lunch preparation and that the two of them frequently went out for lunch (for which Glenn used Bakala's credit card with his permission). In her verified complaint, Glenn asserted that as early as 1983, Genevieve required assistance with her medications. Glenn subsequently stated that Genevieve did not need this help.[1] To Glenn's credit, the record demonstrates that she spent considerable time with Genevieve and provided material assistance for her. The nature and extent of that assistance, however, was limited: mostly, Glenn helped Genevieve run the antiques business, drive Genevieve, and helped with some of Genevieve's meals. (It bears note that Bakala himself was involved in caring for Genevieve by occasionally driving her to appointments and by cooking for her and Glenn.) This support and assistance, however, was the natural evolution of the relationship the two enjoyed throughout Glenn's adult life, which she spent in residence with her mother.

In appreciation of Glenn's efforts, Bakala extended considerable generosity. However, he was generous toward Glenn in other facets of her life. For example, when Glenn was financially overextended, Bakala paid off her personal credit card obligation in excess of $3,000 – with Glenn's agreement that she would not use credit cards any

---

[1] In addition to the discrepancies within Glenn's testimony noted in the text, there are other aspects of the record that reflect poorly on Glenn's credibility. For example, she testified that she executed the verified complaint without reading it. Attempts to rehabilitate this testimony on redirect examination were not successful: she stated then that she "basically" read the final draft of the verified complaint, but she added that "this does not mean I understood it." Further, when asked about her view of the significance of the witness oath at trial, she stated that she "basically" took it seriously. As a result of the successful challenges to her credibility, the court is unable to place meaningful weight on much of her testimony.

4

longer. Bakala paid for repairs to Glenn's Florida house and contributed $10,000 toward the mortgage obligation. Glenn does not allege that Bakala assumed these obligations for any reason other than his willingness to provide financial assistance to her. This demonstrates Bakala's willingness to provide her with support gratuitously.

Bakala also established a track record of generosity toward others. As is noted above, he purchased the Parish House itself and paid for repairs, improvements and ongoing expenses, all for Genevieve' benefit. He provided her with a place to stay while she was in Maine. The record also reveals without dispute that Bakala was generous toward his friends, by giving gifts of personalty and cash, sometimes without any particular reason. Bakala simply found satisfaction in such altruistic and benevolent acts.

The court finds that, in keeping with this spirit of generosity, he developed an intention to convey the Parish House to Glenn upon his death. To accomplish this, he executed a will in 1995, under which virtually his entire estate would devolve to Glenn. *See* plaintiff's exhibit 6. These assets would include the Parish House. In February 2002 and again in January 2005, Bakala executed new wills that also provided, directly or indirectly, that Glenn would inherit the Parish House. *See* plaintiff's exhibit 5; defendant's exhibit 2B.[2]

In her essential argument in this action, Glenn contends that the terms of Bakala's 2000, 2002 and 2005 wills implemented an enforceable promise that she would inherit the Parish House. The court is unable to reach this conclusion by a high level of probability. *See Maine Eye Care Associates, P.A. v. Gorman*, 2008 ME 36, ¶ 12, 942 A.2d 707, 711 (defining "clear and convincing evidence" as facts that are proven to be "highly probable"). Glenn's contention is inconsistent with a well-established history of conduct where he demonstrates generosity and altruism without any expectation of a return. In other words, when he has conferred benefits on Glenn and others, he has done so without an agreement. Additionally, the court has noted instances where Glenn's credibility is suspect. This materially weakens Glenn's testimony that she and Bakala entered into an agreement that would entitle her to acquire the Parish House.

---

[2] Then, as will be discussed below, Bakala executed a will in August 2006. *See* defendant's exhibit 2C. Under this final instrument, with the exception of a house in Florida, all of the assets of Bakala's estate, including the Parish House, would be inherited by Matilda Bakala, whom Bakala married in 2004.

This specific contention is further weakened by the conflict on this point between her account of the agreement included in the verified complaint and her trial testimony. In the former, she represented that Bakala promised to convey the Parish House to her either during his lifetime or upon his death. However, Glenn's trial testimony is best construed to indicate that Bakala did not agree to transfer the property to her by *inter vivos* gift but rather projected it as an inheritance event.

The plaintiff presented the testimony of several witnesses to whom Bakala allegedly made statements that he intended to convey the Parish House to Glenn as consideration for the services she provided to Genevieve. The testimony of those non-party witnesses, however, does not add to Glenn's claim that Bakala had entered into an enforceable agreement to convey the Parish House to her. Bakala told those witnesses, in various settings, that he intended to convey the property to Glenn because she helped care for Genevieve. Such an intention is nothing more than is shown in the undisputed evidence, demonstrated in the wills that Bakala executed prior to 2006, that he planned to do just that. This is also entirely consistent with his pattern of expressing generosity through tangible gifts.

The testimony of two of those witnesses – Connie Wiberg and Ken Wiberg – goes beyond this and deserves note here. Ms. Wiberg testified that Bakala stated to her that Glenn would receive the Parish House when he died and that she (Glenn) could occupy the premises even prior to his death because eventually it would be hers. The court declines to place meaningful weight on Ms. Wiberg's testimony, because she also stated that prior to the time Bakala married Matilda in 2004, Bakala told her (Wiberg) that Glenn would *not* acquire the Parish House. This account is not credible, because Bakala's will that was in effect at that time identified Glenn as the devisee of those assets that included the Parish House. Perhaps more importantly, subsequent to Bakala's alleged statement to Wiberg, Bakala executed another will, which expressly provided that Glenn *would* inherit the Parish House.

Ken Wiberg's testimony that Bakala described the Parish House as "payment" to Glenn for the care she provided to Genevieve does not suffer from a comparable failure. However, his characterization of the purpose of the prospective conveyance is

6

insufficient, even in combination with other evidence presented by Glenn, to sustain her burden of proof.

The circumstances under which Bakala disinherited Glenn from his estate suggest that he did not intend to commit himself (or his estate) to a promise that Glenn urges here. Evidence of these circumstances is obviously not dispositive of the question of whether, through his conduct, Bakala in fact entered into a legally enforceable agreement for the conveyance. However, this evidence carries some significance, because it indicates that Bakala did not harbor such an intention.

Bakala removed Glenn as an heir to his estate after she deliberately attempted to undermine his relationship with Matilda, whom he married in 2004. Glenn had had a long-standing friendship with Matilda, and in fact Matilda met Bakala through her. Matilda and Bakala became romantically involved when Matilda was in Maine in 2003, while Bakala was unmarried. Glenn recognized that if the two became married, Glenn might lose her place as an heir to Bakala's estate.[3] In an effort to prevent Bakala from marrying Matilda, Glenn told Bakala that Matilda had "perverts" in her family and that she (Matilda) suffered from a number of unpleasant and potentially communicable dangerous medical conditions. Bakala overcame Glenn's attempts to stave off his marriage to Matilda. At some time after the wedding, Glenn told the parties' brother Richard that, in her view, Matilda wanted to marry Bakala for his money. This comment reflects Glenn's motivations. Then, during a 2005 dinner event attended by Glenn, Bakala and Matilda, Glenn made a comment in Matilda's presence, fully aware that Matilda had a particular aversion to her choice of words.[4]

Because Glenn had treated Matilda badly, in early 2006 Bakala advised Glenn that he would not permit her to occupy the Parish House any longer and instructed her to vacate the premises by July 1. (He later extended that departure date to mid-July, to allow Glenn to hold her traditional July 4th party on site. Bakala also offered to give Glenn $12,000 per year to replace the income she was going to lose because she could no

---

[3] That Glenn saw this possibility indicates by itself that she did not believe that Bakala was obligated to devise the Parish House to her. Rather, she felt the need to resort to the conduct noted in the text, in order to preserve her status as an heir.

[4] The word was a particularly inflammatory racial epithet.

longer operate the antiques business.) Then, in August 2006, Bakala signed a new will that had the effect of devising the Parish House to Matilda. In this context, it is important to note that Bakala's marriage to Matilda itself was not the reason why Bakala later excluded Glenn from participating in his estate. As is noted above, until August 2006 Glenn remained an heir to the estate, even in a will that he executed in 2005, after he had married Matilda. Further, Matilda did not attempt to orchestrate Glenn's exclusion from Bakala's will. In fact, she suggested to Bakala that he should simply deliver a deed for the property to Glenn. (Bakala declined to do so because he was concerned that in the face of Glenn's significant health issues and lack of health care insurance, her health care providers would encumber the property, and because he did not want Glenn to convey the property to a third-party.) Therefore, the reasons for Bakala's decision to disinherit Glenn go well beyond Matilda's interests and the new marriage itself. The root of that decision lies in Bakala's judgment that because of the way she treated and viewed Matilda, she did not deserve Bakala's generosity that had been warranted previously.

For these reasons, the court concludes that Glenn has not established by clear and convincing evidence that she and Bakala had entered into an agreement under which she would be entitled to acquire the Parish House in exchange for care she provided to Genevieve.

Apart from this determination, the court also concludes that Bakala did not induce Glenn to provide care to her through any misrepresentation. Rather, the evidence demonstrates that Glenn provided care to Genevieve, because they had resided together during virtually all of Glenn's adult life and because Glenn felt a personal obligation to assist her mother. As is noted above, Glenn began to spend her summers in Maine, staying at Bakala's house until October 2001 (several months after Genevieve herself moved into the Parish House until returning to Florida for the winter), not because Bakala induced her to do so, but by her own initiative. Then, she helped Genevieve because, as she put it, "she was my mom." In a passage from her deposition testimony presented at trial, Glenn acknowledged that even when Genevieve's personality became more difficult, she chose to continue caring for Genevieve and was unwilling to leave her mother to the care of others because she (Glenn) "couldn't do that." Glenn had already provided some assistance that Genevieve needed, even prior to the time Genevieve began

to spend summers in Maine. Although Glenn also testified that she was motivated to provide care to Genevieve at least in part by Bakala's promise, the court has concluded that Bakala did not make an actual promise to convey the Parish House to her. Glenn's willingness to assist Genevieve is therefore best explained simply by their relationship rather than by an enforceable expectation of financial gain.

For these reasons, the court also concludes that Bakala did not induce Glenn to perform pursuant to any agreement through a misrepresentation about his intentions.

For the same reasons, Glenn has not established that she has a right to the present possession of the premises.

Glenn has asserted a claim that Bakala unlawfully evicted her from the Parish House. Because Glenn does not have a claim to present possession or future possession or ownership of the property, any claim for unlawful possession must be limited to the period of time when Bakala authorized Glenn to remain there. Although Bakala instructed Glenn in January 2006 to vacate the premises by the beginning of July 2006, he subsequently extended that deadline to mid-July as an accommodation to her.[5] In mid-June 2006, Bakala visited the property to see the extent of Glenn's progress removing her personal property from the building. No progress was apparent. On June 29, Bakala terminated telephone and satellite television service to the building. He took these steps because his relationship with Glenn had collapsed and he was concerned that she would generate substantial expenses through telephone calls and pay-per-view television shows. At least from this evidence, the court finds that Bakala, rather than Glenn, paid for these services.

Glenn argues here that when Bakala terminated telephone and satellite television services to the Parish House, he violated 14 M.R.S. § 6014(1), which deems a landlord's willful interruption of any utility service, including telephone service, to be a form of unlawful eviction. This includes those utility services that are under the landlord's control. *Id.*

---

[5] In his written summation, Bakala argues that in January 2006 he told Glenn that she could not return to the Parish House at all, except to retrieve her personalty. Bakala himself testified, however, that he allowed her to stay until the middle of July.

Even though it fell well short of exclusion of Glenn from the property, section 6014(1)(A) deems an illegal eviction to include an act by a landlord to interrupt phone service that is supplied to the tenant. As an initial matter, the court concludes that the parties were engaged in a tenancy relationship. *See Frost Vacationland Properties, Inc. v. Palmer*, 1999 ME 15, ¶ 10, 723 A.2d 418, 421 ("A tenant at will is 'one who holds possession of premises by permission of owner or landlord, but without fixed term.' A tenancy-at-will may arise even if the parties do not agree to payment of rent or a landlord and tenant relation does not exist."[6]). This meant that under section 6014(1)(A), Bakala did not have the right or authority to interrupt telephone service to the premises. He did so nonetheless. Although the telephone number was in Genevieve's name (even though Bakala paid for that service), Genevieve had died four years earlier in 2002. Therefore, the ongoing telephone service was plainly not for Genevieve's benefit but rather arose from Glenn's continuing occupancy of the Parish House. That Glenn had her own cell phone service does not insulate Bakala from liability for a violation of section 6014(1)(A), because the quality of cell phone coverage was poor in that location, and because the interruption of the telephone service to the building itself constitutes the statutory violation. Accordingly, Glenn is entitled to recover statutory damages of $250 and attorney's fees for prosecution of this specific claim.

The court does not treat Bakala's termination of satellite television service as a violation of section 6014(1)(A). Satellite television is qualitatively different from the types of services exemplified in that statutory provision, which include water, heat, power, telephone, sewerage and refrigeration. Satellite television is a luxury item and is not fundamental to modern residential life, as are the types of services noted in the statute. Bakala is not liable on this theory.

The entry shall be:

For the foregoing reasons, on counts 1, 2 and 5 of the complaint, judgment is entered for the defendant.

---

[6] Bakala had limited the duration of Glenn's right to maintain possession of the Parish House, and so the tenancy may not have been one at will. Nonetheless, the arrangement bears all of the other attributes of a tenancy as defined in *Frost Vacationland Properties*, and so the court treats it as such here.

10

On count 3 of the complaint, judgment is entered for the plaintiff in the amount of $250, plus reasonable attorney's fees associated with her prosecution of that claim. Assessment of attorney's fees shall be governed by the procedure established in M.R.Civ.P. 54(b)(3), except that within 14 days of the date an application for attorney's fees is filed, the defendant may file a response to that application, and the plaintiff may file a reply to that response within 7 days of the defendant's filing.

Because, from a functional perspective, the court treats the defendant as the prevailing party in this action, *see Runnells v. Quinn*, 2006 ME 7, ¶ 15, 890 A.2d 713, 717, the defendant is awarded his costs of court.

The temporary restraining order dated July 20, 2006, is vacated effective immediately. The motion to dissolve that order is dismissed as moot.

Dated: April 29, 2008

_____
Justice, Maine Superior Court

RECEIVED & FILED

MAY 02 2008

HANCOCK COUNTY
COURTS

11