STATE OF MAINE
KENNEBEC, ss.

SUPERIOR COURT
CIVIL ACTION
Docket No. RE-2020-22

TIMOTHY TERRELL,
        Plaintiff,

v.

BARBARA McKENNEY,
        Defendant.

)
)
)
)
)
)
)
)

JUDGMENT

By amended complaint, Plaintiff Timothy Terrell (hereinafter Terrell) brings an equitable claim for Unjust Enrichment against Defendant Barbara McKenney (hereinafter McKenney). A bench trial was held on January 26, 2023. Plaintiff was present with his attorney, Kevin P. Sullivan, Esquire, and Defendant was present with her attorney, Alice Knapp, Esquire. Having considered the evidence presented at trial as well as the arguments of the parties, a decision is in order.

Terrell and McKenney have known each other for over 30 years. Both parties had been previously married and have children from prior relationships. In 2008, their friendship grew into a romantic relationship. Terrell, who was going through a divorce, was experiencing financial difficulties. Although he owned his own house at 265 New Road in Richmond, Maine, Terrell was at risk of default on the mortgage. McKenney also owned her own house (without a mortgage) and wanted to help Terrell "get his life on track" and avoid foreclosure. At McKenney's invitation, Terrell moved into her

residence at 908 Alexander Reed Road in Richmond, Maine in September of 2008.[1] The parties lived together at McKenney's residence for approximately 11 years until Dec 28, 2018, when Terrell abruptly ended the relationship.[2] Throughout Terrell did not pay rent although he did contribute to some of the household bills.

Prior to moving in with McKenney, Terrell suffered a back injury at Bath Iron Works where he was employed.[3] After the injury, he was unable to work for a period, and received worker's compensation benefits. Terrell was prescribed Oxycodone, and his prescribed dosage increased over time. Terrell used Oxycodone for 7 years, including when cohabitating with McKenney. He ultimately became addicted to the substance. He also used alcohol regularly.

Terrell attended rehab at the encouragement of McKenney and support of his adult daughter. Terrell completed an in-patient and out-patient treatment program and engaged in successful medication assisted treatment (MAT). With

[1] Terrell also kept the New Road property. His daughter moved in and paid the bills. The daughter could not always afford the monthly mortgage payments, so Terrell continued to help her with payments. Eventually, Terrell was able to refinance the mortgage and restructure the loan which allowed his daughter to take over the payments. Based on the evidence, it is unclear whether Terrell just had an informal arrangement with his daughter or if there was a formal transfer in title.

[2] While both parties agreed that the relationship was strained prior to this for a number of reasons, the court accepts McKenney's assertion that she was still committed to the relationship and was surprised by Terrell's actions in late December.

[3] The exact dates when Terrell was working as compared to when he was injured and collecting workers compensation benefits is unclear from the evidence. The court does find that when Terrell was working, he was paid at a rate of $35.00 an hour, and he earned between $50,000 to $60,000 per year at that rate.

2

McKenney's encouragement, Terrell made a claim against Bath Iron Works.[4] Terrell settled with Bath Iron Works in either late 2013 or early 2014 for between $300,000 and $350,000. He left employment with Bath Iron Works later in 2014.

When Terrell moved in with McKenney, his school age son, Travis, who was just entering the 3rd grade, moved in as well. Travis lived with Terrell and McKenney on the weekdays (Monday through Friday) and spent most weekends with his mother. Terrell lost his childcare for Travis, and McKenney, who has a BA in early childhood development and was previously employed as a social worker at Head Start for 7 years, helped with Travis. Beyond basic care of Travis, McKenney made sure he got on and off the bus, helped him with his daily homework, attended parent teacher conferences with Terrell, and used her skills to assist him with his language, social and emotional development, areas which Travis was having some difficulties. As Terrell's reliance on opioids and alcohol increased, McKenney's daily caretaking of Travis also increased.

Considerable testimony was provided regarding the contributions made (or not made) towards living expenses by Terrell. There was substantial dispute as to the level of payment and involvement Terrell had in the day-to-day expenses. The court finds that although Terrell often contributed to the

---

[4] The evidence is unclear as to when, exactly, Terrell engaged in the substance use treatment or when he sought and obtained the settlement from BIW, but the parties agree he attended treatment prior to the settlement he reached with BIW and the settlement was before he purchased the garage, likely early 2013.

living and household expenses over time, there were many expenses that McKenney paid alone and periods of time when Terrell was marginally contributing. By 2013 or 2014, after receiving his settlement from BIW, the court finds that Terrell contributed more, and the two shared household expenses more equally during the latter part of the relationship. However, Terrell never paid any rent while he lived with McKenney.

In addition to living expenses, McKenney paid a $8,000.00 down payment and the registration fees on a new pickup truck for Terrell. McKenney paid several of the first payments on the truck after purchase. Over time, Terrell took over the payments by 2012. The title was originally in McKenney's name, but she signed the title over to Terrell when the relationship ended. While this evidence demonstrates the relationship between the parties and the manner in which they shared expenses, the court does not find that there was any expectation of repayment or any assertion of a *quid pro quo* financial relationship.

Terrell has skills as a mechanic and enjoys working on automobiles and other similar projects. Wanting to expand on this interest, Terrell asked McKenney if he could build a garage on the property where he could work on vehicles. McKenney told Terrell that she "didn't care" if he built a garage, and that he could do so if he wanted to. McKenney maintained that she did not really want the garage, but that Terrell "was an adult" and so she was not going to stop him "if he really wanted to" build it. In October 2021 (after

4

approximately five years of living together), Terrell hired Maine Contractor's Group, LLC to construct a garage. The contract was between Terrell and Maine Contractor's Group, and the building permit was in Terrell's name alone. The garage was designed by Terrell with the assistance of the contractor and designed sufficient in size to allow him to install a vehicle lift. McKenney was aware that Terrell was working with the builder on design, but she was not involved in the design specifications or negotiations. The court finds that there was no contract and no agreement between the parties regarding the garage.

The total contracted cost of the project was $37,989.00. Pl.'s Exhibit 4, p. 4. To build the garage, Terrell financed the cost by taking out a loan in the amount of $37,989 at his credit union. The loan was in his name alone and secured by money in his account from his back injury settlement. Pl.'s Exhibit 5. His monthly payment for the loan is $198.73. *See* Pl.'s Exhibit 6. Upon full repayment of the loan, he will have paid $47,715.58. Pl.'s Exhibit 5. McKenney was unaware that Terrell financed the garage, and rather believed that he had paid for the construction out of his BIW settlement funds. It was not until after the parties separated, Terrell moved out of McKenney's residence, and this suit ensured did she learn of the outstanding loan. McKenney did not agree to finance the construction or to the terms of the loan. The evidence does not support any intent by McKenney to take on or repay any loan and the court finds as such.

The construction was completed by November of 2014. No oral or written contract or agreement was made between the parties as to the ownership of the garage or the intended use of the garage beyond the understanding that it was Terrell's garage for his mechanic work.

The new garage had 12-foot ceilings; a height specifically necessary according to accommodate a car lift. Once completed, Terrell outfitted the new garage with a car lift, cabinets, benches, and various tools all to allow him to work on vehicles in his spare time. Terrell used the garage throughout the time he lived there to work on cars and occasionally worked on other people's vehicles. Most of the items in the garage belonged to Terrell except for a few miscellaneous items such as a bucket and a leaf blower which belonged to McKenney. Generally, Terrell's equipment and vehicles occupied both bays of the garage. The court finds that there were occasions when McKenney parked her vehicle in there, but not routinely. The court finds that the garage was Terrell's garage.

The parties began to have difficulties in their relationship in late 2018. As the difficulties increased, so did Terrell's alcohol consumption. On December 28, 2018, Terrell informed McKenney that the relationship was over. Although she recognized that the two had grown apart, she was still committed to the relationship and was surprised by his ending of it. After more than a year of trying to make their relationship work, Terrell finally moved out of McKenney's residence in March of 2020. During the year prior to vacating the

6

residence, Terrell spent some time in a hotel and some time at the residence with McKenney. McKenney throughout, even after Terrell moved out permanently, allowed him to use the garage to store all his tools and equipment and to work on his vehicles. Many of the items in the garage were semi-permanent fixtures such as a hard-wired compressor and other electrical items, a vehicle lift, and tool benches which were bolted to the floor.

Terrell filed the instant suit seeking payment of "at least $42,000 for unjust enrichment" along with an award of attorney fees and costs in October of 2020. The court finds that as late as June 22, 2021, Terrell continued to maintain personal property within the garage, and that at no time were efforts made to remove the structure from McKenney's property.

In May of 2021, McKenney worked to secure the removal and sale of Terrell's mechanic's lift, with Terrell's consent. Terrell was given the $2,200.00 received from that sale and McKenney retained no portion of the sale. By letter dated May 19, 2021, McKenney informed Terrell that she wished him to take immediate steps to remove the garage from her property as she did not want it on her property. McKenney maintained her desire to have the garage removed from her property at the hearing.

## Discussion

Terrell contends that McKenney has been unjustly enriched by the garage built on her property by Terrell. To prevail under the equitable principle of unjust enrichment, Terrell must prove three elements: first, that a benefit has been conferred upon McKenney by Terrell; second, an appreciation or

7

knowledge by McKenney of the benefit; and third, that McKenney's "acceptance or retention of the benefit was under such circumstances as to make it inequitable for [her] to retain the benefit without payment of its value." *Me. Eye Care Assocs., P.A. v. Gorman*, 2008 ME 36, ¶ 17, 942 A.2d 707.

In this case, Terrell has demonstrated that a garage was built on McKenney's property and that at the time the garage was designed and subsequently built, McKenney was aware of the plan and acquiesced to Terrell's desire to construct the structure to use as his mechanic's garage. The degree of McKenney's understanding or "appreciation" of any benefit is less clear. As McKenney credibly testified, she believed that Terrell "was an adult" and she was not going to stop him "if he really wanted to" build the garage.

Although McKenney was aware that Terrell wished to build a garage on land owned by her and land where Terrell was also living, she did not engage in any manner in the design or construction of the garage. As stated above, no contractual agreement existed between the parties regarding the garage. Terrell chose to erect the structure for his own use on land owned by someone else and then to leave the premises. Even after the dissolution of the relationship, and Terrell's departure from her home, McKenney allowed Terrell to maintain personal belongings in the garage for a period, and it was not until the filing of the present lawsuit did McKenney finally request that Terrell remove his belongings from her property, including her request that he remove

8

the garage. McKenney does not wish or intend to retain the structure, and therefore, it is not a benefit conferred upon her.[5]

Based on the evidence presented and under the circumstances of this case, the court finds that it is not inequitable for McKenney to retain any value that the presence of this garage adds to her property were Terrell to choose to leave the garage in place.

## Conclusion

Based on the evidence adduced at trial and pursuant to Maine law, it is hereby ORDERED as follows:

Judgment shall enter in favor of Defendant. Further, each party shall be responsible for his or her own attorney fees.

The clerk shall incorporate this Order on the docket by reference pursuant to M.R. Civ. P. 79(a).

Dated: May 25, 2023

Deborah P. Cashman
Justice, Maine Superior Court

---

[5] At trial, Terrell focused on proving the cost of the garage, including the interest on the loan he took without McKenney's knowledge. This misses the mark, however, because the measure of damages is the value of the benefit, and as applied to these facts, would require proof of the increase in value to McKenney's real estate attributable to the improvements. While the cost of improvement is evidence that the court can consider when determining enhanced value, the evidence presented is insufficient to demonstrate any change in the value of McKenney's real estate based on this construction. "'Recovery under the doctrine of unjust enrichment is measured by the value of the benefits that the plaintiff proves are actually received and retained by the defendant . . . .'" *Court v. Kiesman*, 2004 ME 72, ¶ 15 n.3, 850 A.2d 330, 334, quoting *A.F.A.B., Inc. v. Town of Old Orchard Beach*, 639 A.2d 103, 106 (Me. 1994).

Entered on the docket 5/26/2023