MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2014 ME 58
Docket:        Cum-13-291
Argued:        January 14, 2014
Decided:       April 10, 2014

Panel:         SAUFLEY, C.J., and LEVY, MEAD, GORMAN, JABAR and CLIFFORD, JJ.
Majority:      LEVY, MEAD, GORMAN, and JABAR, JJ.
Dissent:       SAUFLEY, C.J., and CLIFFORD, J.


F. LEE BAILEY

v.

BOARD OF BAR EXAMINERS


LEVY, J.

[¶1]  The Board of Bar Examiners appeals from the judgment of a single justice of the Supreme Judicial Court (*Alexander, J.*) concluding that applicant F. Lee Bailey presently possesses the requisite good character and fitness required by M. Bar R. 7.3(j)(5) to be admitted to practice law in Maine.

[¶2]  The Board advances several reasons in support of its position that the single justice erred in authorizing Bailey's admission to the Maine bar.[1]  Because

---

[1]  The Board challenges the judgment's factual findings and legal conclusions, arguing that (1) Bailey has not recognized the wrongfulness and seriousness of the ethical violations that led to his disbarment in Florida in 2001; (2) Bailey was not honest in his bar application and in his testimony before the Board; (3) at least three tribunals have found that Bailey testified falsely since 1996; (4) Bailey provided a false proffer of evidence to the United States District Court for the District of Massachusetts in 2005 in connection with his reciprocal disbarment in that court; (5) Bailey underreported his income for federal tax purposes and had an outstanding federal tax obligation in the amount of $4.5 million; (6) Bailey made several unwarranted attacks on the judges who have ruled against him as well as on the Department of

we conclude that the single justice erred with respect to the Board's principal assertion—that Bailey failed to prove by clear and convincing evidence that he recognizes the wrongfulness and seriousness of the misconduct that resulted in his disbarment—we vacate the judgment on that basis and do not reach the Board's other contentions.

## I. BACKGROUND

A. Bailey's Representation of Claude Duboc

[¶3] In 1994, Bailey, who had practiced primarily as a criminal-defense attorney for many years, began defending Claude Duboc against charges of drug smuggling and money laundering and related claims for asset forfeiture in the United States District Court for the Northern District of Florida. Bailey was disbarred in Florida in 2001 due to misconduct in connection with his representation of Duboc, and was reciprocally disbarred in the state and federal courts of Massachusetts in 2003 and 2006, respectively. The Florida Supreme Court, in its decision ordering Bailey's disbarment, set out the following factual background based upon the findings of Circuit Judge Cynthia Ellis, who acted as the referee in the disbarment proceedings:

---

Justice; and (7) Bailey failed to comply with Massachusetts income tax laws when he was a resident of that state.

In 1994, Bailey represented Duboc in a criminal case filed against Duboc by the United States alleging violations of Title 21 of the United States Code, which prohibits drug smuggling. The indictment also included forfeiture claims under Title 18 of the United States Code. Bailey worked out a deal with the United States Attorneys ("U.S. Attorneys") covering Duboc's plea, repatriation of assets, and payment of attorneys' fees. Under the agreement, Duboc would plead guilty and forfeit all of his assets to the United States Government. All of Duboc's cash accounts from around the world would be transferred to an account identified by the U.S. Attorney's Office. To deal with the forfeiture of Duboc's real and personal property, 602,000 shares of Biochem Pharma ("Biochem") stock, valued at $5,891,352.00, would be transferred into Bailey's Swiss account. Bailey would use these funds to market, maintain and liquidate Duboc's French properties and all other assets. . . .

The ultimate strategy employed by [Bailey] was that Duboc would plead guilty and forfeit all assets to the United States Government in the hopes of a reduction of sentence based on what Bailey described as "extraordinary cooperation." First, Duboc would identify and transfer all cash accounts from around the world into an account identified by the United States Attorney's Office.

The forfeiture of the real and personal properties held in foreign countries presented some nettlesome problems. Duboc owned two large estates in France and valuable car collections, boats, furnishings and art works. Most of these properties were physically located in France. The two estates required substantial infusions of cash for maintenance.

The idea proposed by Bailey was to segregate an asset, a particular asset, one that would appreciate in value over time, so that when it came time for Duboc to be sentenced following entry of a plea of guilty, the United States Government would not argue in opposition to a defense claim that part of the appreciation in value was not forfeitable to the United States. Ultimately, the object was to sequester a fund which would not be entirely subject to forfeiture.

4

The identified asset was 602,000 shares of Biochem Pharma Stock. This would serve as a fund from which Bailey could serve as trustee and guardian of Duboc's French properties. Duboc's primary interest was to maximize the amount of forfeitures that would be turned over to the United States. This stock would provide a sufficient fund from which to market, maintain and liquidate the French properties and all other assets. Bailey explained that it would be prudent to hold the Biochem stock because the company was conducting promising research on a cure for AIDS, and the loss the government would suffer if large blocks of stock were dumped on the market.

Money was transferred immediately into a covert account identified by the United States Attorney's Office. Duboc provided written instructions to the various financial institutions and the orders were then faxed. On April 26, 1994, the Biochem stock certificates were transferred to Bailey's Swiss account at his direction. [Bailey] provided the account number.

On May 17, 1994, United States District Court Judge Maurice Paul held a pre-plea conference in his chambers. At the conference, the following arrangement as to attorneys' fees, including those for Bailey, was reached: "The remainder value of the stock which was being segregated out would be returned to the court at the end of the day, and from that asset . . . a motion would be filed for a reasonable attorney's fee for Mr. Bailey." Later in the day on May 17, Duboc pled guilty to two counts in open court and professed his complete cooperation with the U.S. Attorney's Office.

*Florida Bar v. Bailey*, 803 So. 2d 683, 685-86 (Fla. 2001) (per curiam) (quotation marks omitted) (alterations omitted).

[¶4]   During the course of Bailey's management of Duboc's assets, the market value of the Biochem stock[2] increased significantly.  After the stock was transferred to Bailey's Credit Suisse account in Switzerland, Bailey sold some shares and borrowed against the remaining shares, deriving over $4 million in proceeds.  He then transferred over $3.5 million of the Biochem proceeds from the Credit Suisse account to his personal money market account, and by December 1995 he had transferred all but $350,000 of that amount to his personal checking account.  From this personal account, Bailey wrote checks totaling over $2 million to his private businesses and nearly $1.3 million for personal expenses and purchases.  Bailey also paid $138,946 from his money market account towards the purchase of a personal residence.   Bailey used a substantial portion of the remaining funds to pay the expenses of maintaining and liquidating Duboc's French holdings.

[¶5]   By late 1995, Duboc had become dissatisfied with Bailey's representation and filed a motion to substitute new counsel for Bailey.  Five days before the scheduled hearing, Bailey sent a letter to Judge Paul without copying the prosecutors, Duboc, or Duboc's new attorneys.  Bailey's letter referred to Duboc, in quotes, as a "multimillionaire druggie" and alleged, among other things, that

---

[2]  For purposes of consistency with the single justice's opinion and *Florida Bar v. Bailey*, 803 So. 2d 683 (Fla. 2001) (per curiam), we refer to Biochem Pharma as "Biochem."

Duboc's new attorneys had a conflict of interest and were giving Duboc harmful advice. At the end of the letter, Bailey acknowledged its ex parte nature: "I have sent no copies of this letter to anyone, since I believe its distribution is within Your Honor's sound discretion."

[¶6] Following a hearing, Judge Paul entered an order on January 12, 1996, removing Bailey as Duboc's counsel. The order also froze all of Duboc's assets held by Bailey and required Bailey to submit a complete accounting of Duboc's money and property that he held in trust. Despite his knowledge of the January 12 order, Bailey thereafter spent over $300,000 of the Biochem proceeds for his own purposes. Judge Paul issued a second order on January 25, 1996, mandating that Bailey surrender all of the shares of the Biochem stock or any replacement assets, and prepare a full accounting of the assets he received from Duboc, including any disbursements he made from those assets. Bailey then notified the Swiss government that the Biochem shares and proceeds in his Swiss bank account were the fruits of drug trafficking, which resulted in the Swiss authorities freezing the account. As a result, Bailey did not surrender the stock or proceeds as he was required to do. Judge Paul subsequently scheduled a hearing to determine if Bailey should be held in contempt.

[¶7] At the contempt hearing held on February 2, 1996, Bailey testified under oath that he did not physically see the January 12 and January 25 orders until

that very morning. Judge Paul held Bailey in contempt for violation of the orders, and ordered his incarceration until he could purge himself of contempt by producing the requested accountings and the stock, and repaying to the court the amount he had withdrawn. When Judge Paul determined that he had substantially complied with the court's contempt order, Bailey was released from incarceration after forty-four days.

[¶8]   Ultimately, Judge Paul approved $1.2 million of the approximately $1.6 million in expenditures Bailey claimed to have made to manage Duboc's assets. Because Bailey had already spent more than the approved expenses, he was ordered to pay an additional $423,737 to the court. The court also ordered Bailey to return the sum that he had withdrawn from the Swiss account and spent for personal purposes. On appeal, the United States Court of Appeals for the Eleventh Circuit rejected Bailey's contention that Judge Paul was biased against him and should have been recused, and affirmed the court's allowance of expenses with one minor exception. *United States v. Bailey*, 175 F.3d 966, 968-70 (11th Cir. 1999) (per curiam).

B.     Bailey's Disbarment

[¶9]   In July 2000, after a five-day hearing on the Florida Bar's petition for Bailey's disbarment, Judge Ellis found that Bailey had committed various ethical violations, including misappropriation of client assets and commingling them with

8

personal assets, ex parte communication, self-dealing, conflict of interest, and false testimony under oath. Judge Ellis rejected Bailey's argument that because the Biochem stock was transferred to him in "fee simple absolute," he was entitled to treat the stock and its appreciation as his own. In arriving at a proposed sanction, Judge Ellis noted that Bailey was sixty-seven years old at the time of the misconduct and had been practicing law for many years. She applied the aggravating factors of substantial experience in the practice of law, selfish motive, pattern of misconduct, multiple offenses, and refusal to acknowledge the wrongful nature of his misconduct. Emphasizing the egregiousness of Bailey's ethical violations and the aggravating factors, Judge Ellis recommended that Bailey be permanently disbarred.

[¶10] On appeal, the Florida Supreme Court upheld all of Judge Ellis's findings and conclusions regarding the six counts of ethical violations, noting that Bailey had "committed some of the most egregious rules violations possible." *Florida Bar*, 803 So. 2d at 690, 694. The court ordered Bailey disbarred with eligibility to apply for readmission after a period of five years. *Id.* at 695. Bailey appealed to the United States Supreme Court, which denied certiorari. *Bailey v.*

*Florida Bar*, 535 U.S. 1056 (2002). Subsequently, Bailey was reciprocally disbarred in both the state and federal courts of Massachusetts.[3]

[¶11] After Bailey's disbarment in Florida, the Biochem stock continued to be a subject of dispute. In 2002, the United States Court of Federal Claims rejected a claim Bailey brought against the United States in which he contended that the government had breached an implied-in-fact contract to transfer the stock to him in fee simple absolute. *Bailey v. United States*, 54 Fed. Cl. 459, 485-87 (2002), *aff'd*, *Bailey v. United States*, 94 F. App'x. 828 (Fed. Cir. 2004). In January 2013, the United States Tax Court determined that Bailey owed taxes and penalties in the amount of $1.9 million, not including statutory interest, resulting in part from his failure to report as income a portion of the Biochem proceeds that he had treated as his own. *Bailey v. Comm'r*, No. 3080-08 (T.C. Jan. 11, 2013); *Bailey v. Comm'r*, No. 3081-08 (T.C. Jan. 11, 2013); *Bailey v. Comm'r*, 103 T.C.M. (CCH) 1499, 2012 WL 1082928, at *22 (T.C. Apr. 2, 2012). In July 2013, the Internal Revenue Service (IRS) filed tax liens against Bailey in the

---

[3] In ordering Bailey's disbarment, the Massachusetts Supreme Judicial Court denied Bailey's request for a de novo hearing based on his allegation, among others, that Judge Ellis was biased against him. *In re Bailey*, 786 N.E.2d 337, 340-41 (Mass. 2003). Likewise, in Bailey's reciprocal disbarment proceeding in the United States District Court for the District of Massachusetts, a three-judge panel denied Bailey's request for an evidentiary hearing to present new evidence regarding the agreement Bailey entered into with the prosecutors in the Duboc case, noting that the precise nature of the agreement was not dispositive because Bailey's disbarment did not hinge exclusively on his mishandling of the stock. *In re Bailey*, No. M.B.D. NO. 02-10093, 2005 WL 2901885, at *4 (D. Mass. Nov. 1, 2005), *aff'd*, *In re Bailey*, 450 F.3d 71 (1st Cir. 2006) (per curiam).

approximate sum of $4.5 million, which included statutory interest on Bailey's tax liability.[4]  Bailey appealed the Tax Court's decision, and the United States Court of Appeals for the First Circuit affirmed.  *Bailey v. Internal Revenue Serv.*, No. 13-1455 (1st Cir. Mar. 14, 2014).

C.    Bailey's Application to the Maine Bar

[¶12]  In February 2012, ten years after his disbarment in Florida, Bailey applied for admission to practice law in Maine and passed the Maine bar exam.  In November 2012, following a testimonial hearing, the Board of Bar Examiners concluded in a five-to-four decision that Bailey had failed to meet his burden of proving, by clear and convincing evidence, that he presently possesses the requisite good character and fitness for admission to the Maine bar.  *See* M. Bar R. 7.3(j)(5). The Board found, among other things, that Bailey did not recognize the wrongfulness and seriousness of his prior misconduct that led to his disbarment, that he continued to dispute the Florida Supreme Court's findings regarding his misconduct, and that he continued to challenge the legitimacy of the judicial process that resulted in his disbarment.

[¶13]  Bailey appealed the Board's decision pursuant to M. Bar Admission R. 9(d)(6), and the single justice held a de novo hearing on March 6 and 7, 2013.

---

[4]  Pursuant to M.R. Evid. 201, we take judicial notice of the publicly available federal tax liens.

In April 2013, the single justice entered a judgment concluding that Bailey had met his burden of proving the requisite good character and fitness in all but one respect—his large outstanding tax obligation. The single justice specifically found that Bailey recognizes the wrongfulness and seriousness of the misconduct that led to his disbarment but denied Bailey's petition for a certificate of good character and fitness based on the tax liability alone. The single justice invited the parties to submit motions for reconsideration to address this issue, explaining:

> [T]he existence of large debts can compromise professional judgment and client relations in ways that must be recognized in considering admission applications. The issue of an outstanding, though not final, judgment ordering payment of nearly $2 million must be addressed in consideration of a bar admission. This issue remaining unaddressed is the only bar to this Court's granting Bailey a certificate of good character and fitness to be admitted to the practice of law.

> Bailey has the burden to prove, by clear and convincing evidence, good character and fitness to practice law. With the tax debt issue unresolved, and not seriously addressed at hearing or in the written closing arguments, the Court cannot find present fitness to practice proven by clear and convincing evidence. Accordingly, the Court must deny the petition to grant an unconditional admission and issue a certificate of good character and fitness to practice law. For the present, this denial will be without prejudice to a timely request for reconsideration addressing how, if at all, the Court should treat the obligations indicated in the January 11, 2013, Tax Court orders in reaching its decision on good character and fitness.

[¶14] Bailey subsequently filed a motion for reconsideration. In June 2013, after a hearing, the single justice issued a judgment finding that Bailey, by actively litigating and seeking to resolve the tax debt, "is making a genuine effort to meet

his responsibilities" and had therefore met his burden of proof on this last issue bearing on his character and fitness. The single justice remanded the case to the Board with instructions to issue Bailey a certificate of qualification.

[¶15] The Board filed a motion for further findings and for reconsideration, arguing that the single justice failed to consider evidence bearing negatively on Bailey's character and fitness. The single justice denied the Board's motion, and this appeal followed.

## II. DISCUSSION

[¶16] Maine Bar Rule 7.3(j) governs the admission of attorneys who have been disbarred. Pursuant to Maine Bar Rule 7.3(j)(5), Bailey bore the burden of presenting "clear and convincing evidence demonstrating the moral qualifications, competency, and learning in law required for admission to practice law" in Maine, as well as evidence establishing that "it is likely that [his admission] will not be detrimental to the integrity and standing of the Bar, the administration of justice, or to the public interest." *See also In re Williams*, 2010 ME 121, ¶ 6, 8 A.3d 666 (citing M. Bar R. 7.3(j)(5)); *In re Hughes*, 594 A.2d 1098, 1100-01 (Me. 1991).[5] To determine whether Bailey met this burden, the single justice was required to

---

[5] The Board does not contend that the Maine Bar Rules require disbarred applicants to obtain readmission in the disbarring jurisdiction prior to petitioning for admission in Maine. *See In re Hughes*, 594 A.2d 1098, 1101 n.2.

evaluate whether Bailey demonstrated, among other requirements, that he "recognizes the wrongfulness and seriousness of the misconduct" leading to his disbarment. M. Bar R. 7.3(j)(5)(C).[6] This requirement presents a mixed question of law and fact. *See Bd. of Overseers of the Bar v. Warren*, 2011 ME 124, ¶ 25, 34 A.3d 1103 ("We interpret the meaning of the [bar] rules de novo as a matter of law, and review for clear error the findings of fact that determine the applicability of the rule." (citations omitted)).

[¶17] The Board asserts that the evidentiary record shows that the single justice's finding that Bailey recognizes the wrongfulness and seriousness of his misconduct is clearly erroneous, and that, as a matter of law, Bailey failed to prove this factor because he only admitted to some, but not all, of the misconduct found by the Florida Supreme Court. We interpret the meaning of Rule 7.3(j)(5) de novo as a matter of law and review for clear error the single justice's findings of fact.

---

[6] Rule 7.3(j)(5) enumerates a list of required factors to be considered:

(A)  The petitioner has fully complied with the terms of all prior disciplinary orders;
(B)  The petitioner has neither engaged nor attempted to engage in the unauthorized practice of law;
(C)  The petitioner recognizes the wrongfulness and seriousness of the misconduct;
(D)  The petitioner has not engaged in any other professional misconduct since resignation, suspension or disbarment;
(E)  The petitioner has the requisite honesty and integrity to practice law;
(F)  The petitioner has met the continuing legal education requirements of Rule 12(a)(1) . . . .

M. Bar R. 7.3(j)(5)(A)-(F). "[T]he petitioner must present clear and convincing evidence concerning each of the factors described in Rule 7.3(j)(5)." *Bd. of Overseers of the Bar v. Campbell*, 663 A.2d 11, 13 (Me. 1995).

14

*Warren*, 2011 ME 124, ¶ 25, 34 A.3d 1103. When reviewing on appeal findings of fact that must be proved by clear and convincing evidence, we determine "whether the factfinder could reasonably have been persuaded that the required factual finding was or was not proved to be highly probable." *Taylor v. Comm'r of Mental Health & Mental Retardation*, 481 A.2d 139, 153 (Me. 1984).

A.    Maine Bar Rule 7.3(j)(5)(C)'s Standard for Recognition of the Wrongfulness and Seriousness of Prior Misconduct

[¶18]   We begin by examining the meaning of the phrase "recognizes the wrongfulness and seriousness of the misconduct" as used in Rule 7.3(j)(5)(C), considering (1) the meaning of the term "recognize" as employed in the Rule, and (2) whether, as the Board contends, the Rule required Bailey to demonstrate that he is fully repentant and unambiguously accepts the wrongfulness and seriousness of all of his misconduct.

1.    The Meaning of the Term "Recognize" as Employed in Rule 7.3(j)(5)(C)

[¶19]   The underlying purpose of Rule 7.3(j)(5)(C)'s requirement that a previously disbarred applicant "recognizes the wrongfulness and seriousness of the misconduct" is to ensure that the applicant's readmission "will not be detrimental to the integrity and standing of the Bar, the administration of justice, or to the public interest." M. Bar R. 7.3(j)(5). Because the purpose of the Rule centers on the protection of the public, its standard is directed at whether the disbarred

applicant has been sufficiently rehabilitated to be trusted with the responsibilities of an attorney. *See In re Wigoda,* 395 N.E.2d 571, 574 (Ill. 1979) ("Rehabilitation, the most important consideration in reinstatement proceedings, is a matter of one's return to a beneficial, constructive and trustworthy role." (quotation marks omitted)). Consistent with Rule 7.3(j)(5)'s purpose of protecting the public, we construe the term "recognize" to mean that the applicant must demonstrate that he or she (1) sincerely believes that the prior misconduct, as ultimately determined by the tribunal that imposed the discipline, was wrong and serious, and (2) is capable of identifying similar conduct as wrongful in the future if he or she were to engage in the active practice of law.

> 2. Whether M. Bar R. 7.3(j)(5)(C) Required Bailey to Prove That He Unambiguously Accepts the Wrongfulness and Seriousness of His Misconduct

[¶20] Having construed the term "recognize," we turn to the Board's argument that Rule 7.3(j)(5)(C) requires proof of nothing less than Bailey's unambiguous acceptance of all findings of misconduct that the Florida Supreme Court found. We find this contention unpersuasive.

[¶21] Neither the language of the rule nor its purpose requires that an applicant demonstrate his complete and unambiguous acceptance of all of the findings of wrongdoing in order to establish his good character and fitness. *See* M. Bar R. 7.3(j)(5); *see also In re Williams*, 2010 ME 121, ¶ 10, 8 A.3d 666

(finding that an applicant failed to recognize the wrongfulness and seriousness of his misconduct because he "ignore[d] or minimize[d] the actual misconduct that led to his disbarment"). An applicant's good faith and reasoned dispute with one or more of a tribunal's findings that formed the basis of his disbarment does not preclude the possibility that the applicant sincerely believes that the misconduct, as ultimately determined by the tribunal, was wrong and serious. An applicant could, in good faith, dispute one or more of a tribunal's findings while nonetheless demonstrating respect for the process that was employed and acceptance of the tribunal's conclusions.

[¶22] Other courts have recognized that an applicant's failure to be fully repentant does not preclude a determination that the applicant has been rehabilitated. *See, e.g., In re Sabo*, 49 A.3d 1219, 1228 (D.C. Cir. 2012) ("[A] confession of guilt is not required for a petitioner seeking reinstatement to show that he recognizes the seriousness of his misconduct . . . ." (quotation marks omitted) (alteration omitted)); *In re Mitchell,* 290 S.E.2d 426, 427 (Ga. 1982) ("[C]ontinued assertion of innocence following conviction is not conclusive proof of lack of rehabilitation."); *In re Wigoda,* 395 N.E.2d at 573-74 (distinguishing repentance from rehabilitation); *In re Hiss,* 333 N.E.2d at 437 ("[W]e refuse to disqualify a petitioner for reinstatement solely because he continues to protest his innocence of the crime of which he was convicted."); *In re Page,* 94 P.3d 80,

83 (Okla. 2004) ("[A]n applicant's assertion of innocence, standing alone, is not a bar to reinstatement . . . ."); *In re Walgren,* 708 P.2d 380, 384 (Wash. 1985) (en banc) ("The continued assertion by [the applicant] of his innocence does not reflect negatively on our assessment of his rehabilitation.").

[¶23]  Accordingly, that Bailey does not unambiguously accept all of the findings and conclusions of the Florida Supreme Court is not conclusive as to whether he sincerely believes that his misconduct was wrong and serious and whether he is capable of identifying similar conduct as such in the future as a practicing attorney.  Common sense dictates, however, that the nature and extent of his failure to be fully repentant should be carefully considered when determining his fitness to practice law.  *See, e.g., In re Walgren,* 708 P.2d at 384-85 (contrasting an applicant who maintained that he was wrongly convicted but who nonetheless "accepts the verdict as the law" and "accepts and respects the system which found him guilty of his acts" with one who blamed his misconduct on "bad judgment").  An applicant's attempt to minimize the wrongfulness and seriousness of his or her misconduct, as found by the presiding tribunal, casts doubt on whether the applicant believes the misconduct was wrong or serious.  *See In re Williams*, 2010 ME 121, ¶ 10, 8 A.3d 666 (finding that an applicant failed to recognize the wrongfulness and seriousness of his misconduct because he "ignore[d] or minimize[d] the actual misconduct that led to his disbarment"); *see also In re*

*Sabo*, 49 A.3d at 1225 ("If a petitioner does not acknowledge the seriousness of his or her misconduct, it is difficult to be confident that similar misconduct will not occur in the future." (quotation marks omitted)); *In re Silva*, 29 A.3d 924, 943 (D.C. Cir. 2011) (finding that the applicant's acceptance of the seriousness of his misconduct "rings hollow" in part because "that acknowledgement is tempered by efforts to minimize the harm"); *In re Holker*, 765 N.W.2d 633, 638 (Minn. 2009) (finding that an attorney did not demonstrate sufficient moral change when he "minimized several aspects of his misconduct, emphasizing that this was only one case out of thousands").

[¶24]  We conclude, contrary to the Board's position, that the fact that Bailey is not fully repentant and does not unambiguously admit to all of the misconduct for which he was disbarred does not, standing alone, preclude a finding that he has satisfied Rule 7.3(j)(5)(C)'s requirement.

B.     Whether the Finding that Bailey Recognizes the Wrongfulness and Seriousness of His Misconduct is Supported by Clear and Convincing Evidence

[¶25]  To determine whether an applicant recognizes the wrongfulness and seriousness of his misconduct, a court must necessarily examine the specific misconduct the applicant committed.  The Florida Supreme Court, in adopting Judge Ellis's findings regarding the six counts of ethical violations, found that

Bailey had "committed some of the most egregious rules violations possible, evidencing a complete disregard for the rules governing attorneys":

> Misuse of client funds is one of the most serious offenses a lawyer can commit. . . . Bailey's false testimony and disregard of Judge Paul's orders demonstrate a disturbing lack of respect for the justice system and how it operates. Bailey's self-dealing and willingness to compromise client confidences are especially disturbing. Not only did Bailey use assets that his client intended to forfeit to the U.S. Government for Bailey's own purposes, but Bailey also attempted to further his own interests by disparaging his client in an ex parte letter to the judge who would sentence his client. Bailey's self-dealing constitutes a complete abdication of his duty of loyalty to his client. His willingness to compromise his client for personal gain shows an open disregard for the relationship that must be maintained between attorney and client: one of trust, and one where both individuals work in the client's best interest. Such misconduct strikes at the very center of the professional ethic of an attorney and cannot be tolerated.

*Florida Bar*, 803 So. 2d at 694 (quotation marks omitted) (alteration omitted).

[¶26] The single justice concluded that Bailey had established that he recognizes the wrongfulness and seriousness of the above misconduct, finding:

> [Bailey] testified to this [recognition] at several points, perhaps more unequivocally than in his similar testimony before the Board of Bar Examiners. Particularly, the Court finds that Bailey recognizes that his ex-parte contacts with Judge Paul were wrong, as was his poor recordkeeping, comingling of client and personal funds, and failure to have an explicit written agreement with the Department of Justice lawyers regarding the uses of the Biochem stock and its proceeds that were transferred to him in trust.

In reviewing this determination, we defer to the single justice's credibility determinations. *See Dyer v. Superintendent of Ins.*, 2013 ME 61, ¶ 12, 69 A.3d

416 ("No principle of appellate review is better established than the principle that credibility determinations are left to the sound judgment of the trier of fact." (quotation marks omitted)). We further infer that the single justice would have found all additional facts necessary to support the judgment if those inferred findings are supported by the evidence in the record.[7] *See Pelletier v. Pelletier*, 2012 ME 15, ¶ 20, 36 A.3d 903. We therefore consider whether competent evidence supports the court's explicit and inferred findings, to the standard of clear and convincing evidence, in relation to the specific acts of misconduct for which Bailey was disbarred.

1. Counts I and II: Commingling Related to Duboc's "Japanese Stock"; Misappropriating Trust Funds and Commingling Related to Duboc's Biochem Stock Proceeds

[¶27] We consider together the first two counts of ethical violations relating to Bailey's commingling of client assets with his own and his misappropriation of the Biochem proceeds. Regarding Count I, the Florida Supreme Court adopted Judge Ellis's finding that Bailey, entrusted with the liquidation of Duboc's so-called "Japanese stock," commingled $730,000 of the stock's sale proceeds with his own funds for six weeks before turning the money over to the

---

[7] The Board's motion for findings of fact and for reconsideration, filed in June 2013, did not request findings of fact relating to each of the specific acts of misconduct for which Bailey was disbarred.

government.[8] *Florida Bar*, 803 So. 2d at 686-87, 690. The Florida Supreme Court rejected Bailey's contention that he did not have any personal funds in his account and had inadvertently deposited the stock proceeds into this account. *Id.*

[¶28] Regarding Count II, the Florida Supreme Court adopted Judge Ellis's finding that Bailey commingled and misappropriated over $3 million of the proceeds from Duboc's Biochem shares, and rejected Bailey's arguments that the stock was transferred to him in fee simple absolute and that he properly treated it as his own property.[9] *Id.* at 687, 690-94. The court emphasized that, because the

---

[8] The Florida Supreme Court explained:

Count I of the Bar's complaint charged Bailey with commingling. Bailey was entrusted with liquidating stock that belonged to Duboc, referred to as "the Japanese Stock." Upon liquidation, Bailey was then to transmit the proceeds to the United States. Bailey sold the Japanese stock and deposited approximately $730,000 into his Credit Suisse account on or about July 6, 1994. Bailey then transferred the money into his Barnett Bank Money Market Account. The money was paid to the United States Marshal on or about August 15, 1994. The referee found that Bailey admitted that his money market account was not a lawyer's trust account, nor did Bailey create or maintain it as a separate account for the sole purpose of maintaining the stock proceeds. In concluding that Bailey had engaged in commingling, the referee rejected Bailey's claims that there were no personal funds in the Barnett Bank account at the time Bailey transferred the funds from the Japanese Stock into this account, and that Bailey's deposit of the proceeds into a non-trust account was "inadvertent error." The referee concluded that Bailey violated Rule Regulating the Florida Bar 4-1.15(a) by failing to set up a separate account for these funds and also by commingling client funds with his personal funds.

*Florida Bar*, 803 So. 2d at 686-87.

[9] The Florida Supreme Court explained:

Count II of the Bar's complaint charged Bailey with misappropriating trust funds and commingling. On or about May 9, 1994, the 602,000 shares of Biochem stock were transferred into Bailey's Credit Suisse Investment Account. Bailey sold shares of stock and borrowed against the stock, deriving over $4 million from these activities. Bailey then transferred $3,514,945 of Biochem proceeds from the Credit Suisse account into his

stock was given to Bailey for the benefit of Duboc and, ultimately, the federal government, regardless of the manner in which Bailey held the stock, he was "guilty of the most serious and basic trust account violations" by commingling and treating the stock and its appreciation as his own property. *Id.* at 691. We address Bailey's commingling and misappropriation of proceeds separately.

### a. Commingling

[¶29] Bailey admitted to commingling "on one occasion" when he was questioned before the Board about the Biochem stock.[10] Bailey did not testify or

---

Barnett Bank Money Market Account. Bailey had transferred all but $350,000 of these proceeds into his personal checking account by December 1995. From this account, Bailey wrote checks to his private business enterprises totaling $2,297,696 and another $1,277,433 for other personal expenses or purchases. Bailey further paid $138,946 out of his money market account toward the purchase of a residence.

The referee rejected Bailey's two defenses to the Bar's charge of misappropriation: (1) he never held the stock in trust for Duboc or the United States; rather, it was transferred to him in fee simple absolute; and (2) this stock was not subject to forfeiture. The referee found Bailey guilty of violating Rules Regulating the Florida Bar 3-4.3 (lawyer shall not commit any act that is contrary to honesty and justice), 4-1.15(a) (commingling funds), 4-8.4(b) (lawyer shall not commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer), 4-8.4(c) (lawyer shall not engage in conduct involving deceit, dishonesty, fraud or misrepresentation), and 5-1.1 (requiring money or other property entrusted to an attorney to be held in trust and applied only for a specific purpose).

*Florida Bar*, 803 So. 2d at 687.

[10] Bailey testified before the Board:

[BOARD]:  So do you agree that you commingled funds when you transferred the [Biochem] funds from your Credit Suisse account to your money market account and then to your personal checking account?

[BAILEY]:  I did on one occasion commingle.

introduce other evidence regarding the commingling of the Japanese stock proceeds either before the Board or the single justice.

[¶30]  With regard to the Japanese stock, because Bailey had the burden of production on this issue and there is no evidence in the record from which the court could have found that Bailey recognizes the wrongfulness and seriousness of having commingled the proceeds from Duboc's Japanese stock, we will not infer that the court found that Bailey recognizes the wrongfulness and seriousness of that transgression.

[¶31]  Likewise, the evidence in the record does not support the conclusion that it is highly probable that Bailey recognizes the wrongfulness and seriousness of having commingled the proceeds from Duboc's Biochem stock, as required by the clear and convincing evidence burden of proof.  As the Florida Supreme Court noted, "one of the most solemn obligations that separate lawyers from any other professionals relates to the safeguarding and segregation of a client's property." *Florida Bar*, 803 So. 2d at 693.  By commingling client assets, Bailey was "guilty of the most serious and basic trust account violations." *Id.* at 691.  While Bailey's testimony before the Board that he "did on one occasion commingle" acknowledged the fact that he committed the misconduct, he offered no other testimony that sheds light on whether he believes that this "most serious and basic trust account violation" was indeed seriously wrong.  On this record, we conclude

24

that the fact-finder could not reasonably have been persuaded that the required factual finding—that Bailey recognizes the wrongfulness and seriousness of having commingled the proceeds from Duboc's Biochem stock—was proved to be highly probable, as required by the clear and convincing evidence standard. *See Taylor*, 481 A.2d at 153.

    b.    Misappropriation of the Biochem proceeds

[¶32] At the hearing before the single justice, Bailey admitted to spending approximately $3 million of the Biochem proceeds for his own use, and testified that if the appreciation in the value of the Biochem stock ever belonged to him, as he claimed, "I lost it through my own negligence and perhaps substandard conduct." Bailey minimized the seriousness of this misconduct, however, by explaining that he spent no more than the appreciated value of the stock, which had risen from $5.9 million at the time of the original transfer to over $10 million by January 1996.[11] Bailey further testified before the single justice that he believed that Judge Paul may have implicitly approved some of his personal use of the

---

[11] Specifically, Bailey testified before the single justice:

Q.    So you spent roughly $3 million of the BioChem Pharma's stock during 1994, 1995, and 1996?

A.    Well, I think lumping them together is a bad idea for this reason: I was allowed to draw down, in my view, fees from the original shares of stock and -- and the loans against them. When the stock began to rise, I believe that all of that money was mine. And most of the money that you're speaking of was drawn down after it began to show a profit.

Biochem proceeds.[12] Bailey adheres to the view that it was reasonable to believe that he was entitled to use the stock to pay himself the attorney fees he believed he was owed, and to treat the appreciated value of the Biochem stock as his own, because the parties had agreed to transfer the stock to him in "fee simple and without restriction."[13] Bailey's view contradicts what was determined in the

---

[12] Bailey provided the following testimony before the single justice:

Q. Would you agree that Judge Paul had not approved any of those roughly $3 million in expenditures that you made from the BioChem Pharma proceeds?
A. They were never presented to him, to my knowledge.
Q. So that's a yes, he did not ever approve them?
A. I -- I think implicitly he may have approved some but certainly not the way they should have been approved and that's by court order.
Q. And would you agree the Department of Justice did not expressly approve of your spending that $3 million on your personal and business ventures?
A. That is a conflict which will go on forever, but I will agree to this: I was unable to show their approval at a critical time and have suffered mightily because of it.

[13] Bailey provided the following testimony before the single justice:

Q. Another piece of this that I've heard you testify to, Mr. Bailey, is that you believed the appreciated value of the BioChem Pharma stock belonged to you?
A. Yes, I have testified to that.
Q. And is that what your testimony is today?
A. Well, my testimony today is if it ever did, I lost it through my own negligence and perhaps substandard conduct. There was a time when I thought it was clear that he who takes the downside risk necessarily gets the upside gain; otherwise, you sell the asset as fast as you can and avoid both.
Q. Fair to say the Department of Justice didn't share your view of that agreement?
A. Oh, they denied it, yes.
. . . .
Q. And there was nothing in writing to support your claim, correct? No letters, no e-mails, no written agreement?
A. Well, I think there is.
Q. There are letters that support your view that you were entitled --
A. You said no written agreements. Do you have the transfer letter that caused the funds to go to my account?
Q. All right. Is that your -- your view? That's the document [transferring the Biochem stock to Bailey's account] that entitled you to the appreciation in the stock?

26

Florida disbarment proceeding. *See Florida Bar*, 803 So. 2d at 690-91 (rejecting Bailey's assertion that he never held the stock in trust for Duboc or the United States because it was transferred to him in fee simple absolute, and concluding that, "regardless of the manner in which he was to hold the stock, Bailey is guilty of the most serious and basic trust account violations.").

[¶33] Consistent with his continued claim that the stock belonged to him in fee simple, Bailey repeated before the single justice his position that he had not "misappropriated" the Biochem funds,[14] which was one of the specific ethical violations that the Florida Supreme Court found that Bailey committed. *See Florida Bar*, 803 So. 2d at 687, 690. Bailey then explained that a portion of the withdrawn Biochem funds was for his attorney fees and that, even though he never applied to Judge Paul for approval of his fees, the judge had implicitly approved

---

> A. Well, the transfer purported to be in fee simple and without restriction. Although I didn't see [the transferring document] at the time, I was told that's what it said, and indeed, it does, both in French and in English.
>
> . . . .
>
> Q. At the end of the day, Mr. Bailey, it's fair to say that you spent $3 million that didn't belong to you on your personal and business affairs?
> A. I spent $3 million that has been adjudged was not mine. At the time I spent it, I think I had a reasonable belief that it was mine.

[14] Bailey testified before the single justice:

> Q. So would you agree, Mr. Bailey, that you misappropriated roughly $3 million?
> A. No, sir. Because misappropriated is a word used in criminal law, which is the equivalent of larceny and that takes an intent, and I never had an intent to steal anyone -- anything from anyone.

this arrangement.[15] This argument was also rejected in the Florida Bar proceeding. *Id.* at 692 (stating that even if some of the corpus of the initial Biochem stock was to be used for payment of attorney fees, "Bailey was not entitled to the fee until it was approved by Judge Paul—a fact that Bailey admits in his January 21 letter to Judge Paul, and that he admits in this case.").

[¶34] Lastly, when asked about the mistakes he made, Bailey stated that his mistake was his failure to recognize that the handling of the stock was "riddled with conflicts" and that "the United States Attorney didn't have the authority to make that deal as was ultimately ruled in the Court of Claims."[16] Bailey's

---

[15] Bailey testified before the single justice:

| [BAILEY]: | [United States Attorney] Gregory Miller said, "No. We've given $6 million to the defense for fees and that's enough." |
| | And I said, "Your Honor, we've agreed that we'll be accountable to you ultimately and no money has been taken so far." |
| | And Judge Paul did this, kind of don't worry about that, and we went on. That was what I thought was implicit approval of Miller's statement to him that we have – |

. . . .

THE COURT: You're going to have to describe what you just did.
[BAILEY]: Yes. I meant the motion to show that Judge Paul was showing I'm not worried about that. It's not of great importance. We don't --
THE COURT: He's motioning his arm away.
[BAILEY]: It was kind of -- pff -- I realize --
THE COURT: Describe that.
[BAILEY]: P-f-f. I thought that he accepted the notion and didn't want any further discussion or didn't need any further, I should say.

[16] Bailey testified before the single justice:

Q. I'd just like you from your perspective, if you could, summarize to the Court what you think happened in *DuBoc*. What mistakes did you make that led you to be -- to the order of disbarment there and then the reciprocal order in Massachusetts?

28

professed understanding of these mistakes minimizes the wrongfulness and seriousness of the actual misconduct for which he was disbarred: misappropriating his client's property.

[¶35] In short, Bailey continues to dispute that he misappropriated over $3 million of his client's property and the key predicate facts supporting that finding. The evidence in the record does not support the conclusion that it is highly probable that Bailey recognizes the wrongfulness and seriousness of his misappropriation of the Biochem stock proceeds, as required by the clear and convincing evidence burden of proof.

2. Count III: Violations of Two Federal Court Orders

[¶36] The Florida Supreme Court adopted Judge Ellis's finding that Bailey willfully violated Judge Paul's two orders issued in January 1996: first, by spending over $300,000 from the Biochem proceeds he held in trust despite Judge

---

A. They began, Your Honor, over the acceptance of a fee in the form of stock on April 26th, 1994, a month after I'd been hired and we had a tentative plea agreement in the case. We had an agreed fee of $3,000,000. And it was about to be transferred to my account when a DEA agent said, look, we got stock here which we'll have to really impair. Why don't you take that instead?
    And I didn't know much about stock and didn't think it was a great idea, but my client insisted that I should take the stock. And so I did after a conversation where the prosecutor said, you can have whichever you want, but you understand that if the stock goes down, there's nothing left for you to get a fee.
    And I said fine. And I did that very unwisely.
. . . .
A. In any event, the acceptance of the stock was riddled with conflicts I really didn't see at the outset. Beyond that, it never occurred to me at the time but the United States Attorney didn't have the authority to make that deal as was ultimately ruled in the Court of Claims.

Paul's January 12 order freezing the funds; and second, by failing to surrender the Biochem shares and stock proceeds to the court despite the January 25 order requiring him to do so.[17] *Florida Bar*, 803 So. 2d at 687-88, 690, 693-94.

[¶37] At the hearing before the single justice, Bailey admitted to spending an additional $300,000 for personal purposes after the January 12 order was issued. However, he maintained that his violation of the order was unintentional because

---

[17] The Florida Supreme Court explained:

> Count III charged Bailey with continuing to expend Biochem funds in contravention of two federal court orders. In January 1996, Judge Paul issued two orders regarding the Duboc criminal case; one on the 12th and the other on the 25th. The January 12 order relieved Bailey as Duboc's counsel, substituting the Coudert Brothers law firm. The order further required Bailey to give within 10 days "a full accounting of the monies and properties held in trust by him for the United States of America." The order froze all of the assets received by Bailey from Duboc and further prohibited their disbursement. The January 25 order directed Bailey to bring to a February 1, 1996, hearing all of the shares of Biochem stock that Duboc had turned over to Bailey. The referee found that Bailey continued to use the Biochem proceeds that he held in trust after service and knowledge of the January 12 and January 25, 1996, orders. The referee rejected Bailey's argument that the January 25 order did not restrain him from utilizing the funds to meet his prior financial obligations, finding that "the order . . . require[d] [Bailey] to bring with him the Biochem Pharma stock or any replacement asset . . . . Clearly there were judicial restraints in place when the money was disbursed."

> The referee found Bailey guilty of violating Rules Regulating the Florida Bar 3-4.3 (lawyer shall not commit an act that is contrary to honesty and justice), rule 4-8.4(b) (lawyer shall not commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer), rule 4-8.4(c) (lawyer shall not engage in conduct involving deceit, dishonesty, fraud or misrepresentation), and rule 5-1.1 (requiring money or other property entrusted to an attorney to be held in trust and applied only for a specific purpose). The referee further found that by knowingly expending trust account funds from the money market account after entry of the January 12 order, Bailey violated Rules Regulating the Florida Bar 3-4.3, 4-3.4(c) (lawyer shall not knowingly disobey an obligation under the rules of a tribunal), 4-8.4(a) (lawyer shall not violate the Rules of Professional Conduct), and 4-8.4(d) (lawyer shall not engage in conduct that is prejudicial to the administration of justice).

*Florida Bar*, 803 So. 2d at 687-88.

30

he mistakenly assumed that the January 25 order superseded the January 12 order.[18] There is simply no language, however, in either order that would justify a

---

[18] Bailey testified before the single justice:

Q. Do you recall that after learning of [the January 12] order you spent at least an additional $300,000 of BioChem Pharma proceeds on your personal and business obligations?

A. Well, I did spend additional funds, and I did so improperly because I assumed that the January 25th order had supervened any prior orders now that suit had been filed. And I didn't read it as prohibiting distribution of what was already in my account. That was a presumption I never should have made. I should have found out whether the government thought it supervened the original order or whether the judge did, and so those transfers were made improperly.

Q. So is it your testimony, Mr. Bailey, that you assumed that one order that you claim not to have read supervened an earlier order that you claimed not to have read?

A. No. I'm saying that an order which was read to me, and I don't see a distinction between reading and having something read to you, if you have a reasonably well-developed memory. I'm claiming that I thought that order was the new order and controlled by supervening, and I'm saying to you that was not good lawyering on my part. It was a selfish position to take.

Q. Would you agree that Exhibit 27 [the January 25 order] did not supervene Exhibit 26 [the January 12 order]?

A. It doesn't say anything about supervening it nor does it say anything about 26 still being in force. It doesn't speak either way. But I think a lawyer should assume that they're both in force, and I did not.

Q. Well, rather than make assumptions, Mr. Bailey, let--let's look at Exhibit 26 for a second, the order of Judge Paul.

A. Uh-huh.

Q. And Paragraph 5 frees all DuBoc-related assets unless off -- excuse me -- and prohibits any further disbursement unless authorized by this court?

A. Yes, that's what it says.

Q. Did Judge Paul ever authorize any further disbursements of DuBoc funds in your accounts after January 12, 1996?

A. No, he did not. But please bear in mind between January 12th and January 25th I made no disbursements of DuBoc's money. I spent money that came in from other cases.

Q. And is it your contention that Exhibit 27, the January 25th order, authorized you to spend DuBoc money in your bank accounts?

A. No. It did not authorize anything.

Q. Would you agree that you violated [the January 25 order], Mr. Bailey?

A. In retrospect, I would say I did.

Q. And would you agree that you violated [the January 12 order]?

reasonable attorney—particularly an attorney who claims not to have personally read either order prior to February 2, 1996—in assuming that the January 25 order superseded the provision in the January 12 order freezing Duboc's assets in Bailey's possession. Although Bailey recognized that his decision to treat the January 25 order as superseding the January 12 order was "not good lawyering" and "a selfish position to take," he further testified that he did not violate the January 12 order "[u]nless you view [the January 12 and 25 orders] as running in parallel." This justification was squarely rejected in the Florida disbarment proceeding and minimizes the wrongfulness and seriousness of Bailey's misconduct in, among other things, "knowingly disobey[ing] an obligation under the rules of a tribunal." *Florida Bar*, 803 So. 2d at 687-88.

[¶38] In addition, although Bailey admitted to the single justice that he violated the January 25 order, he continued to disavow responsibility for having arranged for the notice to the Swiss government that caused it to freeze Bailey's

---

A. No. Unless you view them as running in parallel after January 27th and the answer is yes.

What I'm telling you is between January 12th of '96 and January 25th, I spent $40,000, which came from a law firm in New York for cases we had settled, not any money attributable to *DuBoc*. So I don't think this order [January 12 order] is violated until after this one [January 25 order] comes into existence.

But you're quite right. It's proper to consider this one [January 12 order] still viable, and then it was violated.

32

account.[19]

[¶39]  Based on Bailey's testimony, it is not possible to conclude that it is highly probable that he recognizes the wrongfulness and seriousness of his violation of Judge Paul's orders, as required by the clear and convincing evidence burden of proof.

3.    Count IV: False Testimony

[¶40]  The Florida Supreme Court adopted Judge Ellis's finding that Bailey testified falsely before Judge Paul, and again in the Florida bar hearing, that he did not see either the January 12 or the January 25 order until the morning of the civil contempt hearing held on February 2, 1996.[20] *Florida Bar*, 803 So. 2d at 688, 690.

---

[19]  Bailey testified before the single justice:

> Q.    The referee in Florida found that after you learned of the substance of Exhibit 27 [the January 25 order], you arranged for the Swiss government to be notified so that the BioChem Pharma shares were frozen by the Swiss government?
> A.    She found as a fact that I engineered that. The truth is my lawyer did do it. I learned about it afterwards, but I don't think it made any difference. It was frozen under Swiss law, and the freeze was rather quickly removed, thanks mostly to my efforts.

[20]  The Florida Supreme Court explained:

> Count IV of the Bar's complaint charged Bailey with giving false testimony. The referee found that Bailey testified falsely before Judge Paul and the U.S. Attorneys that he did not see the January 12 or January 25 orders until the morning of a civil contempt hearing held on February 2, 1996. The referee further found that Bailey was not being truthful when: (1) in his answer to the Bar's complaint, Bailey denied that he had received the orders and that he had testified falsely before Judge Paul; and (2) Bailey testified before the referee at the final hearing.
>
> Specifically, the referee found numerous reasons why this testimony was false. First, Bailey had a conversation with the Assistant U.S. Attorney about the terms of the

[¶41]  In his testimony before the single justice, Bailey again asserted that he did not see or read the January 12 and January 25 orders until the morning of the contempt hearing.[21]  Bailey also testified, however, that he was to some degree aware of the contents of the orders because his associate had read them to him over the phone.  Relying on this distinction, Bailey maintained that his testimony before

---

January 12 order following its entry. Indeed, on January 19, when Bailey met with the Assistant U.S. Attorneys, he accused them of obtaining the order from the judge ex parte. In addition, when Bailey returned to his Palm Beach office on January 18, he marshaled documents in support of the accounting that the January 12 order required him to provide. In the letter to Judge Paul dated January 21, 1996, Bailey "plainly concedes that he knew of the terms of the order as early as January 16, 1996." In that letter, he referred to the manner, mode and method by which Judge Paul entered the order. He complained in the letter that "Your Honor was persuaded to act on representations which are *at a minimum* subject to sharp challenge." As the referee notes, "these assertions could not have been made *unless* [Bailey] had seen the January 12 order." Further, as to the January 25, 1996, order, it was served upon Bailey by "fax transmission, United States mail, and personally by the U.S. Marshal's Service pursuant to the very terms of the order." Based on these factual findings, the referee found Bailey guilty of violating Rules Regulating the Florida Bar 3-4.3, 4-8.4(b), 4-8.4(c), and 4-3.3(a)(1) (lawyer shall not knowingly make a false statement of material fact or law to a tribunal).

*Florida Bar*, 803 So. 2d at 688 (alteration in original).

[21]  Bailey testified before the single justice:

Q.  Is it your testimony that you did not read Exhibit 26 [the January 12 order] until February [2], 1996?
A.  It was never in front of me. I certainly would have read it if it had been, but I thought I knew what was in it. It -- I must hasten to add that certainly was substandard performance on my part. I should have made it my business to read the letter and not assume anything, to read the order. And I just didn't do that.
. . . .
Q.  Mr. Bailey, is it fair to say that you have testified previously that you did not see Exhibit 27 [the January 25 order] until February 2nd, 1996?
A.  That's the date on which it was shown to me by Mr. Zuckerman, and that is what I have testified to. I am not testifying that I was unaware of its contents until that date.
Q.  And your testimony is that February 2nd, 1996, was the first time that you saw Exhibit 27?
A.  The first time it was physically in my presence, that's correct.

34

Judge Paul that he had not physically seen the orders at the time he violated them was not false.[22]

[¶42]  In sum, Bailey continued to dispute that he testified falsely before Judge Paul and Judge Ellis as the Florida Supreme Court had found.  Based on Bailey's testimony, it is not possible to conclude that it is highly probable that Bailey recognizes the wrongfulness and seriousness of his false testimony, as required by the clear and convincing evidence burden of proof.

4.      Count V: Self-Dealing in the Representation of Duboc

[¶43]  The Florida Supreme Court adopted Judge Ellis's finding that Bailey engaged in two instances of self-dealing in his representation of Duboc.[23]  *Florida*

---

[22]  Bailey testified before the single justice:  "And I think technically it was after midnight on February 2nd when I first saw [the orders].  But I knew what was in the order.  I'm not backing away from that."

[23]  The Florida court explained:

> Count V of the Bar's complaint charged Bailey with self-dealing in the course of his representation of Duboc. The referee found that Bailey's claim that he owned the stock in fee simple created a financial conflict of interest between Bailey and Duboc. "The more [Bailey] received, the less his client would produce in his column at the time of sentencing." This finding refers to the fact that under the plea agreement, it was in Duboc's interest to maximize the amount of assets he forfeited to the United States Government in hopes of receiving a reduced sentence, and that for Bailey to claim entitlement to the appreciation of the stock would be directly contrary to the interests of his client. The referee concluded that Bailey's claim of entitlement to the stock was in no way consistent with the premise that ultimate approval and payment of fees rested with Judge Paul.

> The referee further found that Bailey used information relating to his representation of Duboc to the disadvantage of his client. The referee found that Bailey managed one of the French properties to his own personal benefit by procrastinating in his efforts to sell the property. The referee ultimately concluded that Bailey had engaged

*Bar*, 803 So. 2d at 688-689, 690. First, Bailey claimed ownership of the Biochem stock that belonged to Duboc and which Duboc planned to forfeit to the federal government in order to receive favorable treatment at sentencing. *Id.* at 688. Second, Bailey procrastinated in selling Duboc's estates in France. *Id.* at 688-89.

[¶44]  On the first point, as noted above, although Bailey explained to the single justice that he failed to recognize that his acceptance of the Biochem stock was "riddled with conflicts,"[24] he did not acknowledge the detriment that his treatment of the stock had to his client's interests. Rather, Bailey only expressed regret for not clarifying who would be entitled to the stock's appreciation, and for not accepting his fees in cash and selling the stock quickly.[25]

---

in self-dealing, and therefore violated Rules Regulating the Florida Bar 4-1.7(b) (lawyer shall not represent a client if lawyer's exercise of independent professional judgment may be materially limited by the lawyer's own interest), 4-1.8(a) (lawyer shall not knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client), and 4-1.8(b) (lawyer shall not use information relating to representation of a client to the disadvantage of the client unless the client consents after consultation).

*Florida Bar*, 803 So. 2d at 688-89.

[24]  *See* Bailey's testimony before the single justice *supra* n.16.

[25]  Bailey testified before the Board:

[BOARD]:  And did you not see it as a conflict at the time to retain the increase in value of the stock when that could have been put to your client's benefit by producing that to the Government which might have had a direct impact on his sentencing?

[BAILEY]:  I didn't see it as a conflict at the time. He had given them 30 million; I was trying to give them another 35 from the French properties. I had been offered cash and should have taken it and we wouldn't be here, and it was a mistake not to clarify from the outset where any profits would go.

36

[¶45]  On the second point, Bailey contended before the single justice that Judge Ellis had erred in finding that he had procrastinated in selling Duboc's estates to prolong his personal use of the properties; rather, he explained that he delayed selling the properties in order to garner a better price for them.[26]

[¶46]  Bailey's present view of his actions minimizes the wrongfulness and seriousness of his self-dealing as determined in the Florida Bar proceeding.  Based on Bailey's testimony, it is not possible to conclude that it is highly probable that he recognizes the wrongfulness and seriousness of this misconduct, as required by the clear and convincing evidence burden of proof.

---

| [BOARD]: | In retrospect, do you see that as a conflict? |
|---|---|
| [BAILEY]: | Oh, certainly, a bad conflict. |
| [BOARD]: | Yeah, and had you not made a -- taken the position that you were entitled to that increase in value but rather had turned it over to the Government, then that may have had an impact on proceedings at that point in time in your client's benefit? |
| [BAILEY]: | Well, in retrospect, sir, I should have sold the stock very quickly and turned it into cash and avoided this issue. The reason the stock was given to me was because the Government felt they had to sell it in a block, and this little company might have croaked; more important, they had agreed to give me 3.5 million in cash. It was in the same account in Luxembourg and they asked me to take the stock. I never should have done it. When I did it, I should have sold it as quickly as I could and given the balance, if it was more than 3.5, the agreed amount, to whoever the Government told me to. |

[26]  Bailey testified before the single justice:

Q.    The trial judge who presided over your disbarment proceeding found that you deliberately procrastinated with respect to the sale of Le Belvoire so that you could enjoy it, is that correct?

A.    Well, with all due respect to Referee Ellis, she was in error. I wrote a letter saying I was in no hurry to sell it because we were being offered crumbs, and it was a ploy to tell the marketplace to stop offering crumbs.

5.      Count VII: Ex Parte Communications, Self-Dealing, and Disclosure of Confidential Information

[¶47] The Florida Supreme Court adopted Judge Ellis's finding that Bailey sent an ex parte letter to Judge Paul in which he stated that Duboc had pleaded guilty because he had no defense due to the strength of the case, referred to Duboc as a "multimillionaire druggie," alleged that Duboc, by consulting with other attorneys, was no longer acting in a spirit of cooperation, and disparaged Duboc's new counsel. *Florida Bar*, 803 So. 2d at 689, 690.[27] Judge Ellis also found that

---

[27] The Florida Supreme Court explained:

Count VII of the Bar's complaint charged Bailey with ex parte communications, self-dealing, and disclosure of confidential information. In connection with this count, the referee found that on May 17, 1994, Duboc appeared before Judge Paul and entered a plea and cooperation agreement. Duboc pled guilty to counts II and III of the indictment. The referee found that the only way Duboc would get a reduced sentence was if Judge Paul was convinced that Duboc had completely and totally cooperated and had forfeited all of his assets to the United States. On January 4, 1996, Bailey wrote a letter to Judge Paul stating, "*I have sent no copies of this letter to anyone,* since I believe its distribution is within Your Honor's sound discretion." (Emphasis added.) This letter contains an express admission that it was ex parte. In this ex parte letter to Judge Paul, Bailey stated that: (1) Duboc pled guilty because he had no defense due to the strength of the case, (2) Duboc chose this course because it was his only option, not in a spirit of remorse or cooperation, (3) Duboc was a "multimillionaire druggie," (4) by consulting with other counsel, Duboc was no longer acting in the spirit of cooperation, and (5) Duboc's new defense team had interests contrary to those of his client and the court. Bailey sent a second letter to Judge Paul on January 21, 1996, a copy of which was sent to the U.S. Attorney's Office, threatening to seek an order to invade the attorney-client privilege in an attempt to defeat Duboc's position that the stock was held in trust.

The referee found that both of Bailey's letters were sent to compromise Duboc before the sentencing judge and to protect Bailey's interest and control of Duboc's and the U.S. Government's money. The referee recommended that Bailey be found guilty of violating Rules Regulating the Florida Bar 4-1.6(a) (lawyer shall not reveal information relating to representation of a client), 4-1.8(a), 4-1.8(b), 4-3.5(a) (lawyer shall not seek to influence a judge), 4-3.5(b) (in an adversary proceeding, lawyer shall not communicate as to the merits of the cause with a judge).

38

Bailey then sent a second letter to Judge Paul, this time copying the U.S. Attorney's Office, threatening to seek an order waiving attorney-client privilege, thereby compromising Duboc's interests in order to protect his own. *Id.* at 689.

[¶48] At the hearing before the single justice, Bailey admitted to sending the ex parte letter to Judge Paul. He admitted that his ex parte communication constituted "unethical conduct" and a "knee-jerk reaction," and expressed regret in writing the letter without having consulted another attorney.[28] He, however, minimized the seriousness of the violation by contending that he sent the letter in an attempt to "alert [Judge Paul] to a serious condition which [Bailey] planned to

---

*Florida Bar*, 803 So. 2d at 689.

[28] Bailey testified before the single justice:

    A.    But I was very concerned about Uscinski [Duboc's new counsel] and his representation of DuBoc. I thought it would not go well. And so quite improperly I wrote a letter to Judge Paul, because I could not get down to see him personally, and tried to warn him that things might not go very well. And it was kind of a you should keep your hands high. And in one paragraph of that letter I used language which I thought he would interpret as very serious language. But he never read the letter, he says.

        In reflection, without question I should have consulted someone, and preferably, I think, a retired judge, because I had access to some, to find out what, if any, would be a proper method to notify a judge ex parte of a situation that I thought should be of his concern. I consulted nobody. I simply wrote the letter.

Bailey further testified before the single justice:

    Q.    Mr. Bailey, when you sent this letter, did you understand you were engaging in unethical conduct?
    A.    If I'd stopped and thought about it, I guess I would have. I would certainly agree now that it was unethical conduct, improper, unwise, and a knee-jerk reaction at a time when I was totally focused on a different case. And I make no excuses for having that transgression.

tell him might involve an attempt to bribe him" for $1 million.[29] Although the ex parte letter to Judge Paul did not mention that Duboc or his new attorneys might attempt to bribe the judge, Bailey maintained that his use of the words "seclusion" and "clear watershed" would suggest to Judge Paul—had he read the letter—that "something improper is in the wind."[30]

[¶49] Before the single justice, Bailey also denied having disparaged Duboc in his letter to Judge Paul, testifying that he had put the phrase "multimillionaire druggie" in quotes to denote that he only repeated what other attorneys had called Duboc.[31] Bailey further denied that the letter revealed to Judge Paul that Duboc

---

[29] Bailey testified before the single justice:

Q.    Mr. Bailey, do you -- do you stand by your testimony that the reason you wrote [the ex parte letter] was to alert Judge Paul to a bribe?
A.    No. The reason I wrote Exhibit 25 was to alert him to a serious condition which I planned to tell him might involve an attempt to bribe him, but he never read the letter. We never had that conversation.
Q.    Because it's fair to say that Exhibit 25 doesn't use the word "bribe," agreed?
A.    It does not use the word "bribe," but if you ascribe the plain meaning to seclusion and clear watershed, I think you get the idea that something improper is in the wind. That's all I was trying to say.

[30] The relevant excerpt from this ex parte letter stated:

Not without some pride in authorship, I believe that I set Mr. Duboc on a course which—if assiduously followed—would have caused his release at the earliest possible date, whatever Your Honor might have determined that to be. It is my fervent wish that if this noble purpose is to be confounded by lawyers who have some other agenda in seclusion, a clear watershed be documented at this juncture of the case.

[31] Bailey testified before the single justice:

Q.    And it's fair to say the letter disparaged your client, Mr. DuBoc, didn't it?
A.    No.
Q.    The letter referred to him as a multi-millionaire druggy?

40

had violated the plea agreement or that it breached confidentiality and attorney-client privilege,[32] explaining that the government knew and had disclosed to Bailey the information alleged in the letter.[33] These explanations minimize the

---

    A.      No, sir. And that's totally unfair. In quotes I said very specifically every lawyer around sees him as a multi-millionaire druggy and they're all giving him advice and it's making things very difficult.

The letter stated, in pertinent part: "In short order, word got out that a 'multi-millionaire druggie' had been arrested, and the interest of many lawyers was evidently stimulated. Mr. Duboc began to consult more attorneys than I can count—which he had every right to do—and was given advice by many that he should have gone to jury verdict."

[32] The letter stated, in pertinent part:

The central purpose of this letter is to alert the Court to the fact that—as never before in my experience—Mr. Duboc's foray into the thicket of legal advice has served him badly in many instances. Without pointing the finger at specific attorneys, suffice it to say that Mr. Duboc was at one time urged to help set up a drug offense so that he could disclose it to the government and win "brownie points" for sentencing purposes. On two other occasions Mr. Duboc was counseled to "hold back" information from Special Agent Carl Lilley and others connected to the prosecution, in order to have "a little something left" to offer in exchange for a Rule 35 motion by the government. A failure to be totally forthcoming during his debriefings would of course have been in total violation of his plea agreement, something I'm sure Mr. Duboc did not comprehend when he received and acted upon this advice.

Footnote 1 of the letter further stated: "I wish to make it very clear that none of these matters represents an incursion upon the attorney-client privilege. Each was known to the government before it was disclosed to me."

[33] Bailey testified before the single justice:

    Q.      Mr. Bailey, did you tell Judge Paul that your client had violated the plea agreement on page 2 of your letter?
          . . . The last full paragraph that begins, A failure to be totally forthcoming during his debriefings would, of course, have been in total violation of his plea agreement, something I'm sure Mr. DuBoc did not comprehend when he received and acted upon this advice.
    A.      Yes. I was not accusing Mr. DuBoc of anything. I said the two lawyers were deliberately giving him legal advice which was totally improper. He had pledged total cooperation and total transparency prior to his plea agreement. And these two fellows who were not his lawyers were advising him to hold back

wrongfulness and seriousness of the misconduct of self-dealing and disclosure of confidential client information.

[¶50]   Although different conclusions may be drawn from Bailey's testimony regarding the letter, the single justice's finding that Bailey recognized the wrongfulness and seriousness of having sent an ex parte letter to Judge Paul is supported by competent evidence in the record.  The evidence, however, does not support the conclusion that it is highly probable that Bailey recognizes the wrongfulness and seriousness of his self-dealing and disclosure of confidential client information, as required by the clear and convincing evidence burden of proof.

6.    Additional Testimony by Bailey Regarding the Wrongfulness and Seriousness of His Misconduct

[¶51]   Bailey testified that although he believed, in retrospect, that the

---

information. And I said I don't think DuBoc realizes that that is a flat violation of his plea agreement, and that's why I'm concerned about his representation.

Q.    Mr. Bailey, isn't it fair to say that you told Judge Paul that, in fact, your client had violated the plea agreement?

A.    I don't think that's what the words say, but --

Q.    All right.

A.    -- without sounding too lawyer-like, may I not suggest that the words speak for themselves. I think I'm telling the judge that he's getting bad advice, and if he acts on it, will be a violation of the plea agreement. I don't think I told the judge that he is withholding the evidence.

But I think you ought to, in fairness, read Footnote 1, which says, I wish to make it clear that none of these matters represents an incursion on the attorney/client privilege. Each was known to the government before it was disclosed to me. And by that I meant they told me about it.

42

Florida Supreme Court had "some grounds . . . that warranted disbarment," he believed that his disbarment was "kind of harsh."[34] He also testified before the Board and the single justice to his continued belief that the bias and animus of others contributed to his disbarment and related setbacks. He testified that the Department of Justice engaged in "obstructive efforts" to "engineer[]" his disbarment; that Judge Ellis was "hostile" toward him; that Judge Paul had developed "distaste" for him; that the Department of Justice obstructed the renomination of Judge Horn to the U.S. Court of Federal Claims "in the hope that she would get the message" to rule against him in the civil complaint he had brought against the federal government in the U.S. Court of Federal Claims; and that the tax agent who investigated Bailey's failure to report income associated with the Biochem proceeds improperly altered his investigative records. Bailey also acknowledged that he filed a pleading with the Tax Court in which he alleged that the Florida Bar, the Department of Justice, and the IRS had conspired to

---

[34] Bailey testified before the single justice:

> Q. Mr. Bailey, it's fair to say that you dispute the legitimacy of the disbarment rendered by the Florida courts?
>
> A. I don't dispute the legitimacy because they did it, the Supreme Court refused cert, and that's the end of the road. And I think they had some grounds, in retrospect, that warranted disbarment. I do think it was kind of harsh.

violate his constitutional rights.[35]  Accordingly, in his testimony, Bailey questioned the integrity of almost all of the legal proceedings related to his misappropriation of Duboc's Biochem stock.  This lack of respect for the judicial process casts further doubt on whether he believes his misconduct was wrong or serious.[36]  *See Bd. of Overseers of the Bar v. Campbell,* 663 A.2d 11, 13 (Me. 1995) ("The efficient and orderly administration of justice cannot be successfully carried on if we allow attorneys to engage in unwarranted attacks on the court, opposing counsel or the jury. . . .  Turbulent, intemperate or irresponsible behavior is a proper basis for the denial of admission to the bar." (quoting *In re Feingold*, 296 A.2d 492, 500 (Me. 1972))).

7.  Testimony By Other Witnesses Bearing on Whether Bailey Recognizes the Wrongfulness and Seriousness of the Misconduct

[¶52]  Before the single justice, multiple witnesses testified to Bailey's love of the law, the devastating effect that disbarment has had on him, and his regret and reformation since disbarment.  For example, witnesses testified that Bailey

---

[35]  Bailey testified before the single justice:

> Q.  It's fair to say, Mr. Bailey, that you told the Tax Court you believe there's an ongoing conspiracy involving the Florida bar, the Department of Justice, and the IRS to violate your constitutional rights?
> A.  I think I put that in a pleading, yes.  Or perhaps an offer of proof.

[36]  The Florida Supreme Court made a similar observation: "Bailey's false testimony and disregard of Judge Paul's orders demonstrate a disturbing lack of respect for the justice system and how it operates." *Florida Bar*, 803 So. 2d at 694.

"had lost something he deeply loved and was going through a lot of pain"; that the Duboc case was Bailey's "one regret" and he was "very sorry for what had happened"; that since his disbarment Bailey has become "a new man," "far more humble," and "much more measured"; that Bailey is actively involved in business and community activities in Maine and elsewhere; and that it was clear that Bailey has recognized his mistakes in the Duboc matter and those mistakes would not be repeated. In particular, Judge Kenneth Fishman of the Superior Court of Massachusetts testified that Bailey's conduct in his representation of Duboc was an "aberration":

> I think Lee recognizes this as well -- that he made some serious mistakes with regard to that case and have lapses of judgment, good judgment in that regard.
>
> But as I've described it before, when you compare what happened in that case with a long distinguished career as a criminal defense attorney, I feel that *DuBoc* was an aberration. It was not indicative of the kind of man or attorney that he is.

[¶53] Witnesses further testified as to the personal difficulty that Bailey faced during the period leading to his disbarment—Bailey was handling too many high-profile cases at once and was constantly traveling; his wife had fallen ill in 1998 and passed away in 1999; and her death caused him great personal

suffering.[37]

[¶54] Bailey's character witnesses testified to their strong beliefs that Bailey regrets the mistakes he made in defending Duboc and that he has suffered profoundly negative personal and professional consequences as a result of his disbarment. Their testimony also demonstrates the high regard in which Bailey is held by many of his professional peers, friends, and business associates, and

---

[37] Patrick McKenna, a private investigator who worked with Bailey, provided the following testimony regarding Bailey's life in the 1999-2000 time period during the Florida bar proceeding:

Q.    Can you tell us whether at that particular time [in 1999-2000] in Lee's life, what do you recall about the circumstances of that time?

A.    Well, I remember when it started, we had a case in New York that I think Judge Fishman referred to. There was a lot of stuff going on in Lee's life. I remembered we had a case in North Carolina that there were a number of lawyers involved. Lee was the lead lawyer. And I think it was right before closing argument -- pardon me -- that Lee got a call from the hospital that Patty [his late-wife] was unconscious and may not make it. So Lee went on and delivered a closing. I think the jury was out 13 minutes, and they acquitted our client. That night at the hotel, Lee broke down in my arms. Sorry.

　　It then became -- I'm not an expert in grief process, but I think that became a point of anger and denial in Lee's life that Patty was going down. So and then the *McCorkle* case, she was dying during the *McCorkle* case, so I was able to, you know, kind of observe Lee, banging away, doing his job as best as he could. But in terms of personal, it was very difficult.

Debbie Elliot, Bailey's current partner, also testified as to Bailey's difficulty during the time of his wife's illness:

Q.    Do you believe that Lee also intends and expects to stay here in Maine?

A.    Yes, yes. He's very -- I suspect, and maybe you've heard testimony about Patty dying, that was not a quick process. She was given that death sentence . . . . And she was told that she had three months to live with pancreatic cancer. And they stretched it to 13 months, but probably the last 12 months of it was not easy for anybody including her. And she would not let Lee tell anybody that she was dying. She didn't want people to feel sorry for her. She was very proud.

　　. . . Lee is a very private person. Patty was too. I mean that was not a quick process, and that was going on during all of those cases. And he was still functioning at a very high level while emotionally he was breaking. I mean, there was no way you couldn't break. I mean Patty was an incredible person.

46

underscores his advanced skills as a legal advocate. As the California Supreme Court recently recognized, however, "the testimony of character witnesses will not suffice by itself to establish [an applicant's] rehabilitation." *In re Glass*, 58 Cal. 4th 500, 525 (Cal. 2014). Here, the character witnesses' testimony does not support the conclusion that it is highly probable that Bailey recognizes the wrongfulness and seriousness of his misconduct to the extent that Bailey's testimony suggests otherwise.[38]

---

[38] After serious consideration, we must reject the dissenting opinion's assertion that this opinion engages in improper "credibility determinations of its own" regarding Bailey's testimony. *See* Dissenting Opinion ¶ 61. By so asserting, the dissenting opinion mischaracterizes what is at issue in this appeal.

The central question here is not witness credibility or the adequacy of the single justice's factual findings, but rather whether the sum of the evidence, viewed in the light most favorable to the court's judgment, supports the single justice's findings and ultimate conclusion that Bailey recognizes the wrongfulness and seriousness of his various acts of misconduct as required by Maine Bar Rule 7.3(j)(5)(C). Our analysis turns on the sufficiency of the evidence and not on a reexamination of witness credibility. *See Me. Eye Care Assocs. P.A. v. Gorman*, 2008 ME 36, ¶ 12, 942 A.2d 707; *Taylor v. Comm'r of Mental Health & Mental Retardation*, 481 A.2d 139, 153 (Me. 1984).

The dissenting opinion contains no discussion of the record evidence concerning each of the six counts of ethical violations that formed the basis of Bailey's disbarment. By treating "misconduct" as used in Rule 7(j)(5) as an amorphous and general concept, the dissenting opinion avoids the tedious but necessary consideration of the sufficiency of the evidence in relation to specific acts of misconduct. As we discussed at length earlier, in his testimony before the single justice, Bailey failed to acknowledge as wrongful and serious his misconduct in commingling the Japanese stock (Count I); commingling and misappropriating client trust funds (Count II); failing to freeze assets and surrender the Biochem stock pursuant to the January 12 and 25 orders (Count III); giving false testimony before Judge Paul (Count IV); self-dealing (Count V and VII); and disclosing confidential client information (Count VII). These acts of misconduct were among those justifiably characterized by the Florida Supreme Court as "some of the most egregious rules violations possible." *Florida Bar*, 803 So. 2d at 694. Bailey's failure to prove that he recognizes the wrongfulness and seriousness of these acts—acts of misconduct that are central to Bailey's disbarment—defeats his request.

C.    Conclusion

[¶55]   The clear and convincing standard is applied where "a higher than ordinary degree of certitude" is required to achieve the applicable public policy. *Taylor v. Comm'r of Mental Health & Mental Retardation*, 481 A.2d 139, 149 (Me. 1984).   We apply this heightened burden of proof in deciding whether to readmit previously disbarred applicants because "we are required specifically to determine that [such] reinstatement will not be detrimental to the public interest." *In re Hughes*, 594 A.2d 1098, 1101 (Me. 1991).   Further, "the policies that motivated the imposition of the clear and convincing evidence standard apply with equal force at both the factfinding and appellate stages." *Taylor*, 481 A.2d at 153 (quotation marks omitted).

[¶56]   Viewing Bailey's actions as identified in the six counts of misconduct, we conclude that Bailey met his burden of proof by clear and convincing evidence only with respect to the question of whether he recognizes the wrongfulness and seriousness of having sent an ex parte communication to Judge Paul (Count VII).  As to the remaining misconduct, the evidence in the record does not support the conclusion that it is highly probable that Bailey recognizes the wrongfulness and seriousness of commingling the Japanese stock (Count I), commingling and misappropriating the Biochem stock (Count II), violating two federal court orders (Count III), false testimony (Count IV), self-dealing in his

treatment of the Biochem stock (Count V), and self-dealing and disclosure of confidential client information (Count VII). By continuing to question many of the findings and conclusions reached by the Florida Supreme Court, and by suggesting that Judge Ellis and the other judges who presided in his cases were biased and that the Florida proceedings were the product of a conspiracy to deprive him of his constitutional rights, Bailey minimizes the wrongfulness and seriousness of the misconduct for which he was disbarred.

[¶57] As previously discussed, an applicant is not required to demonstrate that he or she completely and unambiguously accepts all of the findings of misconduct to satisfy the requirement of M. Bar R. 7.3(j)(5)(C). Here, however, Bailey failed to demonstrate that he is sufficiently rehabilitated by proving that it is highly probable that he recognizes the wrongfulness and seriousness of most of the misconduct he committed. Considered as a whole, the record evidence was insufficient to prove, by clear and convincing evidence, that Bailey recognizes the wrongfulness and seriousness of his misconduct. Accordingly, the single justice erred by reaching the opposite conclusion and, consequently, by ultimately concluding that Bailey's "reinstatement will not be detrimental to the integrity and standing of the Bar, the administration of justice, or the public interest." *See* M. Bar R. 7.3(j)(5).

The entry is:

> Judgment vacated. Remanded for entry of a judgment affirming the order of the Board of Bar Examiners.

---

SAUFLEY, C.J., and CLIFFORD, J., dissenting.

[¶58] Because the Court has acted outside its appellate function in vacating the factual findings of the single justice who heard the evidence in this matter, and because we would instead remand this matter on the single issue of F. Lee Bailey's plan for avoiding violations of the Maine Bar Rules while responsible for a significant federal tax obligation, we respectfully dissent.

## I. LEGAL FRAMEWORK

[¶59] We have no quarrel with the Court's well-crafted analysis of the applicant's burden of proof and the Court's standard of review on appeal. As the Court properly observed, it was Bailey's "burden to present 'clear and convincing evidence demonstrating the moral qualifications, competency, and learning in law required for admission to practice law in this State,'" and to establish that "'reinstatement will not be detrimental to the integrity and standing of the Bar, the administration of justice, or to the public interest.'" *In re Williams*, 2010 ME 121,

50

¶ 6, 8 A.3d 666 (quoting M. Bar R. 7.3(j)(5)).[39] On appeal, we review the factual findings of the single justice reached by clear and convincing evidence for clear error to determine whether the justice, based on the evidence and any reasonable inferences that may be drawn from that evidence,[40] "could reasonably have been persuaded that the required findings were proved to be highly probable." *Me. Eye Care Assocs. P.A. v. Gorman*, 2008 ME 36, ¶ 12, 942 A.2d 707 (quotation marks omitted); *see In re Hughes*, 608 A.2d 1220, 1220 (Me. 1992) (reviewing whether a single justice erred in finding that an applicant for admission to the Bar had proved her good moral character "to a high degree of probability").

[¶60]     The Court also properly analyzed the law and determined that complete and unambiguous acceptance of previous wrongdoing is not a prerequisite for a finding of good character and fitness pursuant to Maine Bar Rule 7.3(j)(5).  Court's Opinion ¶ 21.  We agree with the Court that common sense

---

[39]  Maine is not a jurisdiction in which an attorney who is subject to disciplinary sanctions in another jurisdiction is barred from seeking admission to practice.  *Compare* M. Bar R. 7.3(h) *with* Tex. R. Governing Admission to the Bar IV(e)(2) (stating that an individual disciplined for professional misconduct in another jurisdiction "is deemed not to have present good moral character and fitness and is therefore ineligible to file an Application for Admission to the Texas Bar during the period of such discipline" unless the attorney has regained a license in the other jurisdiction or five years have passed). Nor does Maine have a reciprocal discipline provision similar to the type in place in Florida, which precludes admission or readmission if the in-state disbarment or disciplinary resignation is based on conduct that occurred in a foreign jurisdiction and the person has not been "readmitted in the foreign jurisdiction in which the conduct that resulted in discipline occurred."  Fla. State Bar Admission R. 2-13.1.

[40]  *See U.S. Bank, Nat'l Ass'n v. Thomes*, 2013 ME 60, ¶ 15, 69 A.3d 411.

requires an analysis of "the nature and extent of [an applicant's] failure to be fully repentant." Court's Opinion ¶ 23.

## II. FACTUAL FINDINGS

[¶61]   Despite the Court's recognition of the standards applicable to its appellate review, however, it fails to apply those standards, instead making credibility determinations of its own and choosing to give weight to different evidence than was credited by the single justice. The Court goes astray from its own pronouncements when it decides which facts it believes from among many facts presented at a full hearing.

[¶62]   Specifically, the Court today concludes that the evidence presented could not reasonably have persuaded the single justice that it was highly probable that Bailey "recognizes the wrongfulness and seriousness of the misconduct" that led to his disbarment in another jurisdiction. M. Bar R. 7.3(j)(5)(C). In doing so, the Court reviews the testimony that Bailey provided before the single justice and determines from his uninflected words on the transcript pages that the single justice could not have been persuaded that Bailey recognized the wrongfulness and seriousness of each act that formed a basis for his disbarment. Despite evidence that supports the single justice's findings, the Court amasses other evidence to justify its decision to vacate those findings. As this gathering of evidence suggests, the Court is, in function, making credibility determinations.

[¶63]  Credibility determinations are not, however, properly undertaken by an appellate court.  "[T]he fact finder who hears and sees the witnesses, who observes their hesitations, inflections and emphases, is in a more favorable position to judge their credibility than the appellate court which only reads the printed testimony." *Michaud v. Charles R. Steeves & Sons, Inc.*, 286 A.2d 336, 341 (Me. 1972) (quotation marks omitted).  A witness's credibility is "for the presiding justice to weigh."  *Bd. of Overseers of the Bar v. Dineen*, 481 A.2d 499, 502 (Me. 1984).  "Fact-finders are not required to believe or disbelieve witnesses and are called upon to determine the significance of the evidence and decide what inferences, if any, to draw from that evidence."  *Huber v. Williams*, 2005 ME 40, ¶ 15, 869 A.2d 737.  Furthermore, "the fact-finder may believe some, all, or none of a witness's testimony," *In re Cyr*, 2005 ME 61, ¶ 16, 873 A.2d 355, and "has the prerogative to selectively accept or reject testimony and to combine such testimony in any way," *Jenkins, Inc. v. Walsh Bros., Inc.*, 2001 ME 98, ¶ 22, 776 A.2d 1229 (quotation marks omitted).

[¶64]  Given the testimony of Bailey and other witnesses about Bailey's awareness and acknowledgement of his wrongdoing, we would conclude that the evidence, and any reasonable inferences that may be drawn from that evidence, could reasonably have persuaded the single justice that it was highly probable that

Bailey "recognize[d] the wrongfulness and seriousness of the misconduct" that led to his disbarment. M. Bar R. 7.3(j)(5)(C).

[¶65] Specifically, as the Court recognizes in its opinion, Bailey conceded in his testimony that there were some grounds for disbarment because he did engage in some improper conduct. He testified that he made a mistake in accepting stocks instead of an agreed $3 million fee in the Duboc case: "[T]he acceptance of the stock was riddled with conflicts I really didn't see at the outset." *See* Court's Opinion ¶ 34 & n.16. He also testified that, when he sent the ex parte letter to Judge Paul concerning Duboc, he acted improperly: "I would certainly agree now that it was unethical conduct, improper, unwise, and a knee-jerk reaction at a time when I was totally focused on a different case. And I make no excuses for having that transgression." *See* Court's Opinion ¶ 48 & n.28.

[¶66] He took responsibility for having failed to read the Florida court's January 12, 1996, order prohibiting any sale of stock as soon as the order arrived at his office: "I must hasten to add that certainly was substandard performance on my part. I should have made it my business to read the letter and not assume anything, to read the order. And I just didn't do that." *See* Court's Opinion ¶ 41 n.21. He also accepted responsibility for selling stock after receiving a second order on January 25 without getting clarification about whether the January 25 order supervened the January 12 order: "That was a presumption I never should have

made. I should have found out whether the government thought it supervened the original order or whether the judge did, and so those transfers where made improperly." *See* Court's Opinion ¶ 37 n.18 (quoting, additionally, Bailey's admission before the single justice that, after January 25, he "improperly" spent additional stock proceeds on his personal and business obligations and, "[i]n retrospect, [he] would say [he] did" violate the January 25 order).

[¶67] Bailey's colleagues also testified about their observations of his acknowledgment of the seriousness and wrongfulness of his misconduct since the disbarment. Bailey's former law partner, now a Superior Court Justice in Massachusetts, described Bailey as having been arrogant before his disbarment but more "humble" and "careful" since. He testified that Bailey realizes that he had lapses in judgment and made serious mistakes that he would never repeat. A Maine attorney who has befriended Bailey in Maine since the disbarment also testified that he is "humble." Another Maine lawyer testified that Bailey had expressed to him that he regretted and was sorry for what happened in the Duboc case. A lawyer and former Massachusetts State Senator who has known Bailey since before the disbarment testified that Bailey had "without a doubt" learned from the disbarment. A private investigator and former probation officer who worked with Bailey extensively before the disbarment and remains a friend of his

testified that Bailey is remorseful and accepts his responsibility for what has happened.

[¶68]  Although, given Bailey's testimony explaining or rationalizing his past behavior, the Justices in the majority might not have found as the single justice did if any of them had sat as the trial justice, the function of an appellate court is not to re-weigh the evidence and substitute its findings for those of the fact-finder.  Rather, as an appellate court reviewing the findings in this matter, the Court must determine on appeal whether there is evidence in the record from which the single justice could reasonably have found that it was highly probable that Bailey "recognize[d] the wrongfulness and seriousness of [his] misconduct." M. Bar R. 7.3(j)(5)(C).  The evidence presented here can support a finding that Bailey recognized the wrongfulness and seriousness of his conduct.  We would therefore affirm the single justice's finding that Bailey demonstrated his recognition of the wrongfulness and seriousness of his misconduct.

## III.  REVIEW OF OTHER FINDINGS

[¶69]  Because we would affirm the finding on the recognition of wrongfulness, it would be necessary to review the single justice's other findings of fact.

56

A.      Maine Bar Rule 7.3(j)(5)(A), (B), (D), (E), and (F)

[¶70]   There is ample evidence in the record to demonstrate that Bailey has complied with the terms of all prior disciplinary orders. [41]   *See* M. Bar R. 7.3(j)(5)(A).   He has "neither engaged nor attempted to engage in the unauthorized practice of law," M. Bar R. 7.3(j)(5)(B); has not engaged in any additional misconduct since being disbarred, *see* M. Bar R. 7.3(j)(5)(D); and does not have continuing legal education obligations in Maine because he has never been admitted here before, *see* M. Bar R. 7.3(j)(5)(F).   There is also evidence that can support a finding of the requisite honesty and integrity to practice law.   *See* M. Bar R. 7.3(j)(5)(E).   The remaining question is whether there are any other circumstances that the single justice was required to consider in determining whether Bailey's admission would "be detrimental to the integrity and standing of the Bar, the administration of justice, or to the public interest."   M. Bar R. 7.3(j)(5).

B.      Detriment to the Integrity and Standing of the Bar, the Administration of
        Justice, or the Public Interest

[¶71]   The only remaining factual issue that is relevant here but not addressed by the factors set forth in the rule is whether Bailey's substantial tax

---

[41]   Although Bailey may not fully respect the individual adjudicators who found him to have committed ethical violations, he has by all accounts complied with the resulting orders themselves.

debt creates an unacceptable risk that Bailey's admission would "be detrimental to the integrity and standing of the Bar, the administration of justice, or to the public interest." M. Bar R. 7.3(j)(5). Following the initial evidentiary hearing, the single justice in this matter declined to authorize Bailey's admission to the Bar until Bailey adequately addressed an outstanding judgment against him for a tax obligation that was then estimated to be approximately $2 million. After Bailey moved for reconsideration, the single justice determined that Bailey could be admitted because he was making a genuine effort to meet his tax responsibilities by seeking to resolve the matter through the litigation process and because he had paid or resolved every other obligation that had been imposed on him in a final judgment. As the majority notes, we have learned, since the single justice's ruling, that the United States Court of Appeals has affirmed the decision of the Tax Court. *See Bailey v. IRS*, No. 13-1455 (1st Cir. Mar. 14, 2014). The IRS has filed tax liens of more than $4.5 million against Bailey's property. Accordingly, we would conclude that the single justice's findings must be augmented on this issue.

[¶72]  In determining the propriety of admission, a single justice must consider whether a particular candidate presents a risk to the public if entrusted

58

with client funds.[42] Bailey admittedly used the appreciation in value of stock entrusted to him as Duboc's attorney to pay personal expenses associated with developing an airplane, paying for a house, and maintaining his yacht. He also concedes that he was found in contempt and incarcerated when he could not repay sums that he obtained through sale of that stock, and that he stopped paying his mortgage and consented to a foreclosure on a Florida home when he could not afford payments on that property. In preparation for the pending application to the Maine Bar, he neglected to include information about several aspects of his finances or holdings, and indicated, once again, that he "made a mistake" and "overlooked" certain property. A consistent difficulty in maintaining accurate financial records is evident on this record.

[¶73]  Because we now know that the United States Court of Appeals has affirmed the Tax Court's decision and that Bailey is therefore subject to tax liens of approximately $4.5 million, and because the record contains evidence that Bailey has difficulty maintaining proper financial records, additional evidence and

---

[42]  For instance, in *In re Hughes*, a single justice admitted a candidate to the Bar although she owed $400,000 in restitution after illegally diverting funds from an escrow account to cover law firm and personal expenses in another state. 608 A.2d 1220, 1220 (Me. 1992); *In re Hughes*, 594 A.2d 1098, 1099 (Me. 1991). Her admission was affirmed because she had been working for approximately five years as a paralegal in the Legal Division of the Maine Department of Transportation, had "supervise[d] the expenditure of large amounts of public funds," evidently without incident, and had a financial history that did not preclude a finding of good character despite her failure to make restitution. *In re Hughes*, 608 A.2d at 1220; *In re Hughes*, 594 A.2d at 1099.

analysis are necessary to evaluate whether Bailey's personal obligations could create a risk to the public. Accordingly, we would remand the matter for the single justice to take evidence and reconsider whether the risk that Bailey would mismanage funds in the context of paying his substantial tax debt would render his admission to the Bar "detrimental . . . to the public interest." M. Bar R. 7.3(j)(5).

**On the briefs:**

> Janet T. Mills, Attorney General, and Thomas A. Knowlton, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellant Board Of Bar Examiners
>
> Peter J. DeTroy, Esq., and Devin W. Deane, Esq., Norman, Hanson & DeTroy, LLC, Portland, for appellee F. Lee Bailey

**At oral argument:**

> Thomas A. Knowlton, Asst. Atty. Gen. for appellant Board of Bar Examiners
>
> Peter J. DeTroy, Esq., for appellee F. Lee Bailey

Supreme Judicial Court docket number Bar-12-14
FOR CLERK REFERENCE ONLY